RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0193p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

HAROLD WAYNE NICHOLS,

               *Petitioner-Appellant*,

    *v.*

STANTON HEIDLE, Warden,

               *Respondent-Appellee*.

No. 06-6495

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 1:02-cv-330—R. Allan Edgar, District Judge.

Argued: January 24, 2013

Decided and Filed: July 25, 2013

Before: BATCHELDER, Chief Judge; MARTIN and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Dana C. Hansen Chavis, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. James E. Gaylord, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Dana C. Hansen Chavis, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Mark A. Fulks, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

Batchelder, C. J., delivered the opinion of the court, in which COOK, J., joined. MARTIN, J. (p. 60), delivered a separate concurring opinion.

_____

## OPINION

_____

ALICE M. BATCHELDER, Chief Judge. Petitioner Harold Wayne Nichols, a Tennessee state prisoner awaiting execution, appeals on several grounds the district

court's denial of his petition for writ of habeas corpus.  Finding no merit in any of these grounds, we AFFIRM.

## I.

### *A.  Background*

By any measure, Wayne Nichols had an oppressive and forlorn childhood, due to his father's abuse, his mother's illness, their poverty, and the church-dominated society into which he was born.  Born December 31, 1960, to a poor family in Cleveland, Tennessee, near Chattanooga, he lived in a tiny, run-down house with his father Mac, mother Nanny Lou, and sister Deborah, who was three years older.  The four shared a room.  Mac's mother, Oma, lived in the other room.  They were members of the Church of God of Prophecy and Mac allowed no visitors other than the occasional church member.  Mac was a mean, abusive, and outright vile man.

On June 11, 1961, Mac's sister Betty Sampley and her husband drowned during a family outing, so two of their six children — Royce and Diana, then 13 and 12 years old — moved into the already-crowded Nichols household.[1]  The four younger Sampley children were placed in the nearby Tomlinson Children's Home, an orphanage run by the Church of God of Prophecy.  For the next several years, Mac frequently exposed himself to adolescent Diana, menaced her sexually, and may have sexually assaulted her (the full extent of the abuse is unclear).

In August 1966, Oma died.  In May 1967, Royce graduated from high school and moved out.  And in January 1968, Diana married and moved out.  Nanny Lou had been diagnosed with breast cancer in October 1966 and spent much of the rest of her life bedridden.  Nanny Lou died of breast cancer on January 29, 1971.  Wayne was then 10 years old and was left isolated in the home with just his 13-year-old sister and abusive father.

---

[1]Diana shared a bed with grandmother Oma and Royce slept on an unheated back porch.

Mac continued to abuse Deborah and Wayne physically, and began (or continued) to abuse Deborah (and possibly Wayne) sexually. Mac's sexual abuse of Deborah soon became so flagrant that certain church leaders were compelled to intervene and on August 12, 1971, less than seven months after Nanny Lou's death, the church leaders brokered an agreement with Mac whereby Wayne and Deborah would be removed from his care and, in exchange, the abuse was covered up and Mac was never charged criminally. Wayne and Deborah, then 10 and 13 years old, were placed in the Tomlinson Children's Home. According to testimony and records of operating procedures, this was a stereotypically harsh and inhospitable orphanage.[2] Wayne and Deborah remained there for the next several years. Mac did not visit or interact with them.

On May 1, 1976, Deborah married and moved away, apparently out of the state. On June 28, 1977, Wayne, who was then age 17, was returned to live with Mac.[3] At that time, Mac was receiving disability benefits, drinking heavily, and cavorting with prostitutes. Mac was verbally and physically abusive to Wayne, though apparently not sexually abusive as the record reports only a single incident, in which he propositioned Wayne sexually and Wayne declined. While in high school, Wayne began to roam at night rather than go home.

Wayne graduated from Kirkman Technical High School in August 1979, but had trouble finding work. Over the next two years, he worked a series of minimum-wage jobs and then enlisted in the Army on November 30, 1981. In March 1982, while

---

[2]Testimonial accounts describe the Tomlinson Home as being like a "correctional institution," "the Army," and a "hellacious home." Testimonial accounts describe intense violence and cruelty, including severe lashings and a child forced to eat his own vomit. The Tomlinson Houseparent Guide instructed the houseparents to use corporal punishment "firmly and thoroughly," but cautioned against leaving severe visible bruises.

It is noteworthy that 10 years earlier, in 1961, cousins Diana and Royce Sampley, then ages 12 and 13, were considered too old for the Tomlinson Home and were therefore sent to live with the Nichols. The Nichols children, at ages 10 and 13, might have been the oldest children at the Tomlinson Home during their time there.

[3]At one point, the record says "as he was about to be adopted," which seems unlikely since he was 17 years old. At another point, the record suggests that Wayne was sent back to his father because there were only a few children left at the orphanage and it was closing down, which is reasonable as it did close shortly thereafter.

stationed at Ft. Riley, Kansas, Wayne met a woman and they moved in together, even though she was married to another soldier. They never married but had a daughter, who was born in November 1983. Wayne did not fare well in the Army and was discharged in November 1983, a full two years early. Wayne did not fare well in this relationship either and in early 1984 Wayne left this woman and their daughter in Kansas and returned to Chattanooga.

It is unclear where Wayne was living upon his return to Chattanooga in early 1984, but he likely returned to live with his father, Mac. Wayne was reportedly working at a convenience store.

On the night of August 30, 1984, Wayne climbed through a window into an apartment that was shared by two women. According to Wayne, he intended only to rob the apartment and did not expect anyone to be there. But finding one of the women there, he grabbed her and attempted to rape her. She resisted and Wayne fled. Police arrested Wayne on September 4, 1984, and on December 13, 1984, he pled guilty to burglary and assault with attempt to rape. The court sentenced him to five years in prison, of which he served 18 months. While in prison at the Brushy Mountain State Penitentiary, psychologist Dr. Floyd Doughty prepared a psychological report on Wayne and found nothing remarkable.

Wayne was released on parole April 29, 1986, but missed a parole appointment on July 9, 1986, so his parole officer filed a violation (August 18, 1986), and Wayne went to jail for one month, from September 26, 1986, until October 26, 1986. He was then released and ordered to live with his father until he married his fiancee, Joanne.

Wayne and Joanne married on November 1, 1986. They both had jobs; Joanne at Sathers Candy and Wayne at Godfather's Pizza. They lived with Mac in the beginning, which Joanne recounted as having been awful. Mac was unreasonably demanding and verbally abusive, to which Wayne was apologetic and subservient. Eventually, Joanne and Wayne moved out. By all accounts, their marriage was happy and loving; Joanne was smitten with Wayne right up until his January 1989 arrest for the rapes and murder, and she claimed that he had treated her wonderfully throughout their

relationship. In April 1987, Joanne had surgery for a blocked fallopian tube. And in June 1987, the woman in Kansas filed a paternity suit seeking child support. Wayne settled and paid some money. Otherwise, Wayne and Joanne appeared to be doing fine.

At 11:45 p.m. on June 29, 1987, a woman living in the East Ridge suburb of Chattanooga (almost four miles from Wayne's neighborhood) saw a man in a white t-shirt lurking outside her house and called the police. When the police arrived 10 minutes later, they found Wayne (in a white t-shirt) leaving the woods about 300 feet from the woman's house. Because he did not live in the area and could not give any reason for his being there, the police arrested him for prowling and carrying a dangerous weapon, a knife. On July 29, 1987, Wayne was returned to county jail for a year for the prowling conviction and parole violation. Wayne was released from jail on June 1, 1988. Joanne welcomed him home and Godfather's Pizza welcomed him back to work as though nothing had happened.

But according to Joanne, beginning in July or August of 1988, Wayne began to go out at night alone and stay out all night. He told her he was just restless and, apparently, she believed him. When she worried that he was having an affair, he was able to reassure her that he was not. Their relationship was solid. And, in September 1988, Wayne was promoted to first assistant manager at Godfather's Pizza. So that must have been going well also.

### B.  Crimes

The State prosecuted and convicted Wayne Nichols for the rapes or attempted rapes of 12 women during his three-month rape spree, which spanned the period from September 30, 1988, to January 3, 1989.[4] But based on Nichols's additional confessions

---

[4]In a peculiar tangent, a 16-year-old girl accused Nichols of raping her, "resulting in [her] pregnancy." The State later dismissed this claim after discovering it was false. This girl had worked with Nichols at Godfather's Pizza, had gotten rides to and from work from him, and, according to Joanne, had attended a Christmas party with them the day after the alleged rape without showing any problem with Nichols at that time. Sometime in April 1989, well after Nichols had been arrested and the story of his rape spree publicized, this girl told police that Nichols had sexually harassed her and other female employees on numerous occasions and that he had raped her on December 15, 1988. Nichols vehemently denied committing that particular rape, despite confessing to numerous others, and defense counsel were able to show that Nichols could not have committed that rape as alleged. It turned out that the girl had gotten pregnant and had attempted to cover it up by falsely claiming to have been a victim of Nichols's

and his psychologists' assessments, there were almost certainly more victims and more rapes.

### Victim # 1: Karen Elise Pulley (rape, murder)

On the night of Friday, September 30, 1988, Nichols parked near a house in the Brainerd area of Chattanooga where 21-year-old Karen Pulley lived with two female house mates. Nichols watched the house from outside and saw one of the women dress and leave. Nichols armed himself with a short length of two-by-four lumber,[5] climbed in a bathroom window, and roamed through the house. When he found Karen Pulley in bed and alone, he struck her in the head with the two-by-four, tore her clothes from her, and forcibly raped her vaginally. Afterwards, Nichols hit her in the head several more times with the two-by-four, crushing her skull, and left her on the floor, bleeding and unconscious. Nichols inflicted an astounding amount of damage to Karen Pulley's head and body, as is evident from both the autopsy and the gruesome crime-scene photos, particularly when compared to photos of Karen Pulley from before the murder.

One of Pulley's house mates found her the next morning, alive but unconscious, lying on the floor in a large pool of blood. Pulley died at the hospital later that day — she never regained consciousness. Police investigated relentlessly for three months. They collected samples for all manner of forensic testing, including fingerprinting and biological testing,[6] received and pursued hundreds of tips, questioned over 100 people, and investigated numerous possible suspects, but made no progress toward solving the

---

serial rapes. The prosecution dismissed this charge on October 3, 1989.

This aspect of Nichols's rape cases is perhaps most noteworthy because it demonstrates Nichols's willingness and ability to dispute and defend against a false rape accusation, thereby undermining a suggestion that Nichols's numerous other confessions were the result of coercion or the mere acquiescence to police suggestion. Nichols has abandoned his prior claims that his confessions were the product of coercion and police manipulation, but hints of those accusations linger in his present arguments, including his mitigation argument, and he has only at this stage — the appeal of the denial of his federal habeas corpus petition — abandoned his actual-innocence claim. *See* fn. 6, *infra*.

[5] It is unclear whether Nichols found the two-by-four outside the house or inside, but it is certain that he obtained the two-by-four at the crime scene. Nichols did not bring the two-by-four with him.

[6] Among the numerous biological samples were spermatozoa collected from her gown. Initial testing could not be matched to Nichols and that was part of an actual-innocence claim. But in October 2005, advanced DNA testing matched the sample to Nichols and confirmed that he had been the perpetrator, as he had confessed.

crime. Specifically, the police never suspected Nichols and had not even established that the murder weapon was a two-by-four.

In January 1989, the police identified Nichols as a suspect in a series of other rapes in neighboring communities, discussed *infra*, and after initially denying knowledge of this rape and murder, Nichols confessed and recorded a detailed confession. Nichols eventually pled guilty and, following a sentencing trial, a jury recommended the death penalty, which the court imposed. The sentencing trial and the death sentence are the basis for this appeal.

### *Victim # 2 (rape)*[7]

Sometime shortly after midnight on Thursday, October 20, 1988, Nichols approached a house in the Tiftonia neighborhood of Chattanooga where a 23-year-old married woman was home alone. At about 12:30 a.m., just before going to bed, she unlocked a side door for her husband, who would typically arrive home from work shortly after that hour. Nichols entered through the unlocked door at about 12:45 a.m., picked up a candlestick, and found the woman in her bedroom. He struck her on the head with the candlestick multiple times, leaving wounds that would require stitches, threatened to kill her, choked her, and then raped her vaginally.

Afterward, Nichols warned her not to move, so the woman knelt on the bed, motionless and terrified, until her husband arrived home from work some time later. He called the police. Apparently, Nichols called the house while the police were there — the victim answered and recognized his voice but was too scared to hear what he said. She gave the phone to a police officer, but the record does not contain a police report from those officers about any such phone call.

---

[7]In February 1991, well after the Pulley murder trial and conviction, Nichols entered guilty pleas to six additional rapes or attempted rapes, as part of a plea agreement. Nichols did not appeal any of these six convictions (i.e., Victims # 2, 3, 4, 6, 9, and 10). These crimes comprise a substantial part of Nichols's rape spree and are in the record, but were not formally part of the Pulley murder trial and were only alluded to vaguely during that proceeding.

On state post-conviction review, the state trial court referred to these additional convictions in its denial of Nichols's petition, noting that they would be considered during a potential resentencing. *See* Section II.A, *infra*. The Tennessee Supreme Court, in analyzing Nichols's claim about the order of his trials, referred to Nichols's "forty charges growing out of some fourteen incidents," *Nichols*, 877 S.W.2d at 735. *See* Section II.F, *infra*.

When arrested in January 1989, Nichols confessed to this rape and eventually (after the Pulley murder trial) entered a guilty plea pursuant to a plea agreement. This was the one of six guilty pleas and corresponding convictions that Nichols did not appeal.

### Victim # 3 (rape)

At about 4:45 a.m. on Tuesday, November 1, 1988, Nichols went to a home in the East Ridge suburb of Chattanooga,[8] where a single woman lived alone. The woman awoke to find Nichols standing over her holding a large knife to her throat. Nichols warned her not to scream or he would kill her. He then turned on the light, took her to the closet, and picked out a black skirt, white blouse, and black high heels. He had her dress and then took her back to the bed where he raped her vaginally, ejaculating on the skirt.[9] He had her undress and bathe while he watched. He then told her not to call the police or he would kill her, and left, taking the skirt with him.

Nichols confessed to this rape and eventually (after the Pulley murder trial) entered a guilty plea pursuant to a plea agreement, even though this victim could not identify him. This was one of six guilty pleas and corresponding convictions that Nichols did not appeal.

### Victim # 4 (attempted rape)

At about 12:45 a.m. on Monday, November 21, 1988, Nichols parked outside a house in the Red Bank suburb of Chattanooga, where a 35-year-old single mother lived with her young son. Nichols had been casing this house for some time, possibly weeks. Nichols climbed on a lawn chair in the back yard to open a window, climbed through the window and over the washing machine, and went to the bedroom. Nichols woke the

---

[8]This date was Nichols's second wedding anniversary and this address was walking distance from Nichols's house. Originally, Nichols's wife Joanne had protested that Nichols could not have committed this rape because they had been together on their anniversary, but later she realized that he had left in the middle of that night.

[9]Elsewhere, the record reports that Nichols hit this victim with a vase and took the vase with him, but the police report prepared at the time of the crime does not refer to any vase.

woman and turned on the light but she screamed and fought. They rolled onto the floor, while Nichols struck her several times in the face and head.**10**

When the woman's young son called out, they stopped fighting momentarily. Nichols stood behind the woman and told her to tell the boy everything was okay, which she did. Meanwhile, her dog had come into the room, and she ordered the dog to attack. When the dog moved towards them, Nichols fled taking her purse and a walking cane. The woman followed Nichols outside, screaming at him while he fled to his car. She got her gun from her car and then called the police.

When the police arrived, the woman recounted that a couple of weeks earlier, she had seen a car like Nichols's parked in the same place Nichols had parked on the night of the attack. When she approached the car, it drove off. On a different day around the same time, she had come home to find that someone had gone through her underwear drawer. Also, because the window through which Nichols had climbed in had been painted shut, she surmised that he had pried it open from the inside during an earlier break-in and left it unlocked, unbeknownst to her.

The woman gave the police an accurate description of Nichols and, following his arrest, identified him by photo. Nichols confessed and eventually pled guilty to assault with intent to rape. This was one of six convictions that he did not appeal.

### *Victim # 5 (rape)*

At 1:30 a.m. on Wednesday, December 21, 1988, Nichols went to a house in the East Ridge suburb of Chattanooga, where a single woman lived alone. Nichols watched through a window and saw that she was alone. He entered the house through the front door, which was unlocked, picked up a knife from the kitchen, and found the woman sleeping on a couch in the living room. He woke her, ordered her to the bedroom, cut and tore her clothes off, and armed with a knife, forcibly raped her vaginally. He

---

**10**Photos in the record show that her eye was blackened badly and her face visibly swollen. Also, there is a convoluted reference in the record to Nichols's hitting her with a walking cane, taking the walking cane when he fled, and placing the cane on the victim's porch a couple of nights later. This was never fully explained.

attempted to rape her anally, but could not do so and instead ejaculated on her face. He ordered her into the shower, turned it on, and forced her to wash her hair and face. While his victim was in the shower, Nichols left, taking the knife and her purse with him.[11]

The police showed this victim a photo of Nichols on January 5, 1989, and asked if she could identify him. She could not, but she later identified him when she saw him on TV and again when asked in court. The State tried Nichols to a jury and the jury convicted him of burglary, larceny, and aggravated rape. This was one of the prior violent felonies that the State used as a death-penalty qualifier in the Pulley murder trial.

### Victim # 6 (attempted rape)

At about 1:05 a.m. on Thursday, December 22, 1988, Nichols went to a house in the Tiftonia neighborhood of Chattanooga, where a 35-year-old woman lived alone. Nichols broke in through the back door and found that the woman was in the shower. Nichols took a knife from a kitchen drawer and attacked her when she emerged from the shower, stabbing her several times in the hand and arm. When she fought back, inflicting a cut on Nichols's eye, he fled.

Nichols may have been stalking this woman for some time. In addition to this attempted rape, Nichols was also convicted of attempted burglary of this residence on December 8, 1988. There is no further explanation of this in the record. The absence of any other charges on this earlier date suggests that he could not get in or left because the woman was not home.

This victim gave the police an accurate description of Nichols and, following his arrest, identified him from a photo. Nichols confessed to committing this attack and eventually pled guilty to attempted rape. This was one of six guilty pleas and convictions that he did not appeal.

---

[11]At approximately 8:00 p.m. on January 3, 1989, this victim received a telephone call at her home in which the caller said only, "I want to eat your puss." She later believed the caller was Nichols, based on the voice and the fact that he had her name and phone number from the contents of her purse.

### *Victim # 7 (rape)*

At 11:15 p.m. on Tuesday, December 27, 1988, Nichols went to an address in the Red Bank suburb of Chattanooga, where a single woman lived alone. The woman had returned from a movie and was making trips to her car, carrying items into her house. Nichols, who had entered the residence through a back window, pulled an electrical cord from an iron, surprised her from behind, lynched the cord around her neck, and dragged her back inside. Nichols ordered her to strip and when she delayed, he punched her and ripped off her clothes. When she told him she was menstruating, he punched her several times in the face and head. He forced her to perform oral sex and then forcibly raped her vaginally. He told her not to move and then fled. After about 10 minutes, she called 911.

Nichols confessed to this rape and, during this confession, he began laughing. When police asked why he thought it was so funny, Nichols said: "Well, it's not really funny what happened, but the whole thing is sort of funny." This laughing was reportedly unmistakable on the video of the confession. Nichols entered a guilty plea even though serology evidence could not be matched to him at that time, and the court convicted him of burglary and aggravated rape. This was one of the prior violent felonies used as a death-penalty qualifier in the Pulley murder trial.

### *Victim # 8 (attempted rape)*

On Saturday, December 31, 1988, Nichols went to the Tiftonia neighborhood of Chattanooga, where he attempted to rape a woman in her home. The record contains few specifics. Nichols confessed on video, but this crime was not prosecuted.

On Monday, January 2, 1989, Nichols had been home from work because he was feeling ill and spent the day lying in bed. At about 8:30 or 9:00 p.m., he got up and dressed and told Joanne he was going to get hamburgers. He did not return until 7:00 a.m. the next morning. During that time, Nichols committed three rapes and attempted another.

### *Victim # 9 (rape)*

At 12:15 a.m. on Tuesday, January 3, 1989, Nichols went to an apartment in the East Brainerd or East Ridge neighborhood of Chattanooga, where a 31-year-old single mother lived with her four-year-old daughter. Nichols entered and found the woman and her daughter asleep in the master bed. Nichols threatened to harm the daughter if the woman did not comply, so she told her daughter everything was okay, put a videotape in the VCR for her to watch, and went to the living room with Nichols. Nichols forced her to undress and lie down on the couch; he then raped her vaginally, coercing her with a knife. Nichols told her that if he saw any police at her apartment, he would come back and hurt or kill her daughter. She did not call the police until the next evening. She described Nichols to the police and added that he smelled of cigarettes. She later identified him from a photo line up.

Apparently, Nichols had been watching this victim's apartment for several weeks. On Thanksgiving weekend, six weeks earlier, this woman had returned home to find the windows and doors unlocked. A stick or bar that had secured a sliding door had been removed and put under the couch. Several baskets and other items were oddly out of place and several lights were on that had not been on when she left. She later suspected that the intruder had been Nichols, familiarizing himself with the layout of the apartment and unlocking doors and windows for his entry at a later time.

Nichols confessed to the police and eventually pled guilty to this rape. This was one of six guilty pleas and convictions that he did not appeal.

### *Victim # 10 (attempted burglary with intent to rape)*

At about 1:00 a.m. on Tuesday, January 3, 1989, Nichols arrived at an apartment in the East Ridge suburb of Chattanooga. Nichols cut the window screens and pried at the doors, but could not break in, so he gave up and went next door to the residence of the next victim. When police responded to Victim # 11's 911 call at 3:34 a.m., they searched the area and found that the rear screens of this apartment had been cut and the rear door, front door, and front window had been pried on. Police woke the woman

inside, who had been unaware of the attempted break in. Nichols confessed and pled guilty to "attempted burglary by night with intent to rape." This was one of six guilty pleas and convictions that he did not appeal.

## Victim # 11 (rape)[12]

At about 1:30 a.m. on Tuesday, January 3, 1989, Nichols approached the neighboring apartment (to Victim # 10), where a 28-year-old single mother lived with her children. Nichols pried open the back door with a screwdriver, breaking a window. The woman heard the noise and got out of bed to investigate. Halfway down the stairs, she saw Nichols breaking in and ran back upstairs and called 911. The dispatcher recorded the 911 call at 1:36 a.m. Nichols followed her upstairs, hung up the phone, and ordered her downstairs. The children were sleeping or watching TV upstairs and Nichols threatened to harm her and kill the children if she did not comply. Nichols tore her nightgown off of her and when she begged him to stop, he punched her in the face, again threatened the children, and scratched her in the process, drawing blood. Nichols forcibly raped her orally, vaginally, and anally. He did not ejaculate. Nichols told her not to move until he was gone, but when he left the room, she ran upstairs for a robe. When the police rang the doorbell moments later, the woman answered and Nichols fled out the back. Police pursued unsuccessfully.

This woman initially identified another man as the rapist from a photo array (one Fred Joseph Coats, also suspected in the next rape, Victim # 12), but at a subsequent in-person line up determined that it had not been Coats. She later identified Nichols from a photo array and identified him for a jury in court. Nichols was tried to a jury and convicted of burglary and two counts of aggravated rape. The prosecutor in the Pulley murder trial offered these two rape convictions as two of the five prior violent felonies for death-penalty qualification.

---

[12]This was actually charged and convicted as two separate rapes, so the record reflects that the prosecutor in the Pulley murder trial presented five prior rape convictions as prior violent felonies for purposes of death-penalty qualification, even though the prosecutor actually presented four cases concerning four victims and four incidents.

### Victim # 12 (rape)

At 4:00 a.m. on Tuesday, January 3, 1989, Nichols arrived at a house in the East Ridge suburb of Chattanooga, where a 26-year-old woman lived alone. This woman had returned home at approximately 1:00 a.m. and fallen asleep on her couch. She was awakened by two sharp blows to her head and face. Nichols had entered through a window by climbing on top of her car. Nichols held a knife to her throat and threatened to kill her if she did not comply. He forced her to the bedroom, chose an outfit for her, and forced her to dress in it, all the while threatening her and hitting her. Nichols then forcibly ripped and cut the clothes off of her, cutting her leg in the process. Nichols attempted to rape her anally, but was unable to do so. When she claimed to be nauseous, Nichols turned to get her a wash cloth and she reached for a .38 pistol she had in the night stand. Nichols wrestled the gun away from her, beat her some more, and raped her anally, by force and with the threat of the knife held against her. When he finished, Nichols held the gun to her head and fired the empty chamber, apparently to horrify her or to show it was empty. Nichols forced her into the shower and left while she was showering. She called 911 at 4:43 a.m.

After his arrest, this woman identified Nichols from a photo array. After his confession, police took Nichols to her house and he pointed out where and how he had climbed onto her car to get into the window. During a consensual search of his car, police recovered the woman's gun and the knife from her kitchen. Nichols had also stolen her purse. Nichols entered guilty pleas to burglary, larceny, and aggravated rape.[13] This was one of the prior violent felonies cited as a death-penalty qualifier in the Pulley murder trial.

---

[13]The record mistakenly reports in a couple of places that the State dismissed the charges in this rape case. That is incorrect. The State dismissed an "attempted murder" charge in this case when it was established that Nichols knew, before pulling trigger, that the chamber was empty in the gun and that even the victim had told the police so.

### C.  Arrest and Confession

At 8:10 p.m. on Thursday, January 5, 1989, East Ridge Police Captain Larry Holland received an anonymous phone call from an unidentified man — later determined to be one Chuck Mull,[14] — alleging that Nichols was the serial rapist and providing Nichols's date of birth.  Routine follow-up revealed Nichols's 1984 arrest and conviction for burglary and attempted rape.  Police showed photo-arrays to four of the victims, each of whom identified Nichols immediately.  An arrest warrant issued.

Police arrested Nichols at his home at 11:06 p.m. and took him to the East Ridge police station for questioning, with several officers from different communities present. Nichols signed a waiver of counsel and Miranda rights at 11:23 p.m.  A little over an hour later, at 12:47 a.m. (Friday, January 6, 1989), Nichols recorded a videotaped confession to the rapes of Victims # 3, 5, 11, and 12.

Questioning continued until approximately 4:21 a.m., and then police allowed Nichols to sleep for several hours before beginning questioning again at approximately 11:30 a.m. that same morning (Friday, January 6, 1989).  Nichols confessed to several other rapes and attempted rapes, including several of those described above as well as at least two others that were never prosecuted.[15]  It was suspected by police and even by Nichols's defense psychologists that Nichols had almost certainly committed more rapes than those known.

That evening, police showed pictures of Nichols to some other victims.  Victim # 11 identified him at 5:20 p.m., Victim # 3 identified him an hour later, and then # 12 and # 5.  At 8:00 p.m., the police took Nichols to the Chattanooga Police Department where he made a full confession, on video, to the Pulley rape and murder, a case in

---

[14]Mull was Larry Kilgore's roommate, and possibly romantic partner, who was jealous of Nichols's friendship with Kilgore.  Kilgore had been very fond of Nichols and eventually testified for Nichols at the Pulley murder trial, asserting that Nichols was the best friend he had ever had and insisting that Nichols was the best person he had ever known.  Mull's jealousy of Nichols led him to suspect Nichols when no one else did, and to call the police with the tip.

[15]Nichols confessed to at least two other rapes (Victims # 13 and 14) that he committed in Red Bank.  Neither of these were prosecuted and further details are not contained in the present record.

which he had never until then been a suspect. A few hours later, actually 1:20 a.m. on Saturday, January 7, 1989, Nichols directed a detective to a lot in East Ridge to recover the two-by-four he had used to murder Karen Pulley.[16] On Sunday, January 8, 1989, Joanna Nichols relayed to another police officer that, after his arrest, Nichols had confessed to her about his committing some of the rapes and the Pulley murder.

The State proceeded with indictments on all of the cases individually. On February 1, 1989, the State indicted Nichols for the Pulley rape and murder. On April 5, 1989, Nichols moved the state trial court to compel the State to prosecute his crimes in the chronological order in which they were committed, but the court denied the motion. On July 18, 1989, Kenneth Nickerson, Ph.D., and Fausto Natal, M.D., of the Johnson Mental Health Center, Inc. in Chattanooga, Tennessee, provided the court with a competency report in which they found Nichols competent to stand trial.

### D. Trials and Prosecution

Nichols had the same counsel for all of his trials: Hugh Moore and Rosemarie Bryan. The first significant hearing was September 6, 1989, on Nichols's motion to suppress his confessions in the rape cases. The trial court did not believe Nichols's assertion that he had requested an attorney; found that Nichols had not been coerced; and denied the motion.

The State prosecuted five of the rape charges (concerning four victims) to conviction before initiating the Pulley rape-and-murder trial:

1.) Victim # 7, guilty plea, September 13, 1989, Case No. 175495.

2.) Victim # 12, guilty plea, October 24, 1989, No. 175433.

---

[16]Questions existed about this two-by-four. Forensic investigation found no hair, fibers, blood, or soft tissue on the two-by-four, even though Nichols had crushed Pulley's skull with it and splattered blood all over the room. Also, the two-by-four did not appear weathered even though it had presumably been outside since September. At one point, the record says that one of Pulley's roommates found the two-by-four. The prosecution entered the two-by-four into evidence at Nichols's sentencing trial and the detective testified to its recovery and chain-of-possession. Because Nichols long ago abandoned any claim of error concerning this two-by-four as the murder weapon, it is not an issue now and will not be considered further in this opinion.

3.)  Victim # 11, guilty verdicts (2), January 11, 1990, Nos. 175438 and 178087.

4.)  Victim # 5, guilty verdict, February 21, 1990, No. 180537.

It is noteworthy that, for each of these convictions, Nichols's counsel moved the court to stay the sentencing phase until after the completion of the other guilt-phase determinations, specifically until after the Pulley murder trial.  The court granted the motions and did not sentence Nichols on any of these non-capital convictions until December 13 and 14, 1990.[17]

The Pulley murder trial began on May 7, 1990.  Nichols had requested a change of venue, but the trial court did not change the venue of the trial.  Instead, the trial court selected jurors from another county (Sumner County) and brought them to Hamilton County, where the crimes had occurred, for the trial.  After jury selection, the trial court denied Nichols's motion to suppress his video- and audio-taped confession to the Pulley rape and murder, so Nichols changed his plea and entered guilty pleas to charges of first degree felony murder, aggravated rape, and first degree burglary.[18]  The trial court held a colloquy, accepted the guilty pleas, convicted Nichols, and proceeded to the sentencing phase.

At sentencing, the State sought the death penalty based on two specific, statutory aggravating circumstances:

---

[17]In December 1996, Nichols petitioned for post-conviction relief from these five non-capital sentences, arguing that the trial court had failed to abide by certain state-common-law sentencing principles.  *See Nichols v. Tennessee*, 90 S.W.3d 576, 586 n.4 (Tenn. 2002).  Thereafter, sometime between 1997 and 2002, the post-conviction court granted this petition and held that Nichols was entitled to new sentencing proceedings for these non-capital convictions. *See id.* at 586. The State did not appeal, *id.*, but neither did the state trial court proceed immediately with this re-sentencing, *see Tennessee v. Nichols*, No. E2008-00169, 2009 WL 2633099, *2 (Tenn. Crim. App. Aug. 27, 2009). Eventually, on or about December 17, 2007, the state trial court re-sentenced Nichols on these non-capital convictions, sentencing him to the minimum sentence for each offense, to be served concurrently, for an effective sentence of 25 years. *Id*. at *3.
  Note that Nichols's aggregate effective sentence for the other six non-capital offenses — to which he entered guilty pleas and which he never appealed (i.e., Victims # 2, 3, 4, 6, 9, and 10) — is 225 years. *See id.* at *1.

[18]The State dismissed a charge of premeditated first degree murder.

(1) the murder occurred during commission of a felony (rape);[19] and

(2) Nichols's previous convictions for violent felonies (i.e., the other five rapes).

The State's first two witnesses, Chattanooga Police Officers Clarence Wilhoit and Gary Schroyer, described the Pulley-murder crime scene and authenticated the introduction of her bloody clothing into evidence. The third witness, paramedic William Craig, described Karen Pulley's condition[20] upon his arrival and his medical response, further described the crime scene, and introduced the crime scene photographs. The next two witnesses, Karen Pulley's house mates, testified about Karen Pulley, the house layout, the circumstances surrounding the murder, and the crime scene.[21] The sixth witness, Detective Richard Heck, testified about the crime scene and the ensuing investigation, and re-created the events of the rape and murder for the jury. More importantly, Det. Heck introduced Nichols's videotaped confession, which was played for the jury, and commented on that confession. He also introduced maps Nichols had drawn during the confession and narrated a video, played for the jury, in which the police re-created Nichols's path into and through the house during the murder, as Nichols had described it in his confession. The seventh witness, medical examiner Dr. Frank King, testified about the injuries to Karen Pulley; specifically, the particularities of the sexual assault,[22]

---

[19]The Tennessee Supreme Court later held in *Tennessee v. Middlebrooks*, 840 S.W.2d 317, 346 (Tenn. 1992), that reliance on this factor (i.e., that the murder occurred during the commission of a felony) as a death-penalty-qualifying aggravating circumstance is unconstitutional, in violation of Article I, § 16, of the Tennessee Constitution and the Eighth Amendment to the United States Constitution. On direct appeal in this case, the Tennessee Supreme Court acknowledged this error in Nichols's sentencing, but held it was harmless. *Tennessee v. Nichols*, 877 S.W.2d 722, 725 (Tenn. 1994).

[20]Craig testified that Pulley's head had been crushed so severely that he could not recognize her as a woman and, in fact, because her body and particularly her feet were so small, he had insisted to the other paramedics that she was actually "a small child." Craig further testified that he had "seen many [] violent crimes[,] . . . traffic accidents[,] . . . [and] carnage in [his military] service [in Vietnam], but nothing this brutal, I mean just brutal."

[21]Nichols's defense counsel objected to these first five witnesses — Officers Wilhoit and Schroyer, paramedic Craig, and Pulley's two house mates — arguing that their testimony was irrelevant to the sentencing determination and, therefore, inadmissible. The trial court heard each of their testimonies, in full, outside of the presence of the jury, and then overruled the objection and allowed each of them to testify a second time, in the presence of the jury.

[22]Dr. King testified that, based on his examination, the rape had likely been Karen Pulley's first experience with vaginal sex and because the opening to her hymen was so very small, much smaller than normal, significant force would have been necessary to penetrate the tissue, which he labeled a "traumatic tearing," and would have been very painful.

evidence of her struggle, the force and brutality of the blows to her head, and the nature of her death, including the likelihood that the two-by-four was the murder weapon. He authenticated the autopsy report, as well as several diagrams and photographs, for introduction into evidence. The final witness, Hamilton County Court Clerk Harold Rohen, introduced the records of Nichols's five other rape convictions that were offered as death-penalty-qualifying, aggravating circumstances.

The defense argued for mitigation based on Nichols's admission of guilt, cooperation with police, and the psychological effects of his troubled childhood. The defense produced witnesses who testified to Nichols's good character and passive nature — his wife Joanne, a friend and coworker named Larry Kilgore, and three preachers familiar with his childhood and the orphanage: Rev. L. E. Butler, Rev. Winston Gonia, and Rev. Charles Hawkins. Joanne testified that she and Nichols had "the perfect marriage," that Nichols "was always caring, kind, and nice," and that her family adored him, so she was shocked by the crimes. She conceded that Nichols had confessed to her, but pled for his life, insisting that while he "should [not] be out on the streets," he did not "deserve[] the electric chair." Kilgore testified that, even knowing of the crimes, he considered Nichols the "best friend that [he had] ever had" and "one of the nicest men [he had] ever known." Rev. Butler testified that he had known Nichols since he was "a very small child," that Nichols had a religious upbringing, and that, in meeting with him since the murders, Nichols had "shown remorse . . . a repentant spirit, remorseful spirit." Rev. Butler then opined about "demon possession" and that Nichols had been under the control of an evil spirit, but conceded on cross-examination that Nichols had never sought help for this perceived demon possession nor shown any remorse before his arrest. Rev. Gonia testified that Nichols had been a good child and, though Nichols had done horrible things, "[a]s far as I know . . . , he's still a good person." Rev. Hawkins testified that he had known Nichols as a boy at the Tomlinson Home and had also spoken with Nichols in jail since his arrest. He remembered Nichols as "a very fine young man" and viewed him in jail as remorseful and "more like the Wayne [Nichols] that I knew as a boy growing up."

Nichols testified about his personal history, including his childhood (though he could not remember if his father was abusive to him), his time at the orphanage, his early adulthood (including the attempted rape in 1984), and his relationships with Mac and Joanne. Nichols also discussed his crimes, asserting that he knew the rapes were "wrong and terrible," and that he had not wanted to do them, but that a "strange feeling" compelled him and he had been unable to control it. He specifically admitted to the Pulley rape and murder, though he insisted that he had not meant to kill Karen Pulley and was remorseful. On cross-examination he conceded that if he had not been arrested he would have continued prowling at night and raping women, and that he had confessed primarily to set the record straight because the police had been falsely accusing him of other rapes, assaults, and even child molestation, that he had not committed.

Dr. Eric Engum, a psychologist who is also a lawyer, testified as a psychological expert for the defense. Dr. Engum had diagnosed Nichols with "intermittent explosive disorder," a type of "impulse control disorder" in which Nichols's "ability to resist [wa]s overwhelmed." Dr. Engum found no organic brain injury and attributed this diagnosis to "psychosocial factors", explaining:

> The types of things that the experts in the field identify [as causal factors] are [a] punitive, hostile environment in which the child is raised, maybe alcoholic, abusive parent, abandonment, lack of love or empathy in the family unit, estrangement or essentially being socially isolated from the social milieu or, as we say, the world as it exists. Social isolation[,] I guess[,] is the best term. Tremendous feelings of impotence, and what I say by that is a person who feels that they're not worth anything, they're not important, who've met a lot of defeats in life and kind of internalized that and get the picture of themselves as somebody who really has not succeeded in anything. They see themselves in a very negative light.
>
> . . .
>
> [F]rom the evidence that I was able to pull together over many months, it appears that [Nichols] was at a number of points in his life subjected to a punitive, aggressive, hostile father. It also appears that at various points in his life figures to whom he bonded, mother, grandmother were just ripped away from him. For instance, his first remembrance is at age five. He simply remembers his grandmother dying without any warning,

without even being aware. At age ten, even though his mother had been sick for a long time, he apparently was never told of that, and one day she literally dies. He's taken away and put in an orphanage. He has - - - he bonds with a number of different house parents and they mysteriously disappear. And it seems that his life is through that. So you have a child who builds up this sense of being abandoned and he responds angrily.

. . .

There is a huge gap [in his memory] and I should emphasize. From before age ten, from before the time he went into the orphanage he has minimal recollection of any events in his lifetime. And consistent with the diagnosis, most authorities believe that that's an attempt simply to repress all of the bad and negative things that occurred during his early years. And so the child essentially internalizes the anger and frustration, and it can either stay internalized or it can explode at various times.

Dr. Engum was careful to note that, in his opinion, Nichols had been aware of the wrongfulness of his actions, but had been unable to control them and was remorseful afterwards.

On cross-examination, Dr. Engum explained that Nichols's sister had refused to speak with him for his investigation, despite significant efforts. An aunt and uncle had also refused. And he had been unable to locate anyone, other than Rev. Gonia, to discuss the Tomlinson Children's Home. But the most important part of Dr. Engum's cross-examination testimony concerned the State's use of his notes to impeach his testimony and undermine his credibility. Because defense counsel had not requested, and Dr. Engum had not prepared, an expert report to give to the State, the trial court ordered the defense to turn over Dr. Engum's notes.[23] Using those notes, the State

---

[23]Before calling an expert witness, an attorney must provide a report as to what the expert will testify, or else make the expert available for deposition. Tenn. R. Crim. P. 16(b)(1)(B)(iii); *see also* Tenn. R. Civ. P 26.02(4)(A)(ii); *Coe v. Tenn.*, 17 S.W.3d 193, 214 (Tenn. 2000). Nichols's counsel did neither. When the State told the court that defense counsel had not provided any expert report (or even identified any expert), despite the State's express discovery request for such a report, defense counsel argued that they were not obliged to provide a report because their expert, Dr. Engum, had not prepared a written report. They offered him for deposition, but as this was now the middle of trial — with the time for declaration of experts and opportunity for depositions long since past — the court rejected that offer and ordered defense counsel to produce any written notes that Dr. Engum had prepared. Defense counsel argued that those notes were privileged work product, but the court disagreed and reviewed them *in camera*. Meanwhile, defense counsel had Dr. Engum hastily prepare a report over the lunch recess and offered that instead. The court rejected that offer as well, explaining that such a report was long past due. Defense counsel provided the court with Dr. Engum's numerous written notes and letters, which included not only Dr. Engum's psychological assessment of Nichols, but his opinion of witnesses and suggestions of legal defense strategies. After *in camera* review, the court provided those documents to the State as

portrayed Dr. Engum as a defense team lawyer, not an independent psychologist, who was actively trying to persuade (or trick) the jury. For example, in his correspondence with defense counsel, Dr. Engum repeatedly referred to "us" and "we" as though he were part of the defense team, such as in the statement: "Joanne provides a wealth of information which I believe will help us at least support an argument for the irresistible impulse defense."[24] Moreover, concerning potential defense witness Rev. L. E. Butler, Dr. Engum wrote to defense counsel:

> Reverend Butler is the type of individual that I characterize [as] the limited public figure. He would probably protest all the way to the stand and then revel and bask in the notoriety of his testimony. I believe that his testimony could also be fairly powerful. As we have discussed, we are trying to build a mitigating factor of irresistible impulse. . . . Reverend Butler can add to the persuasiveness of this argument by recasting the irresistible impulse into possession by the devil. This may have a great impact and influence upon those members of the jury with religious leanings. . . . The only negative note that he might bring is with regard to [Nichols]'s choice to let the devil into his heart. Reverend Butler also states that if only [Nichols] had chosen to come back into the church, none of this would have happened. Hence, we need to be very careful that Reverend Butler does not recast this 'possession theme' into an active, voluntary, knowing choice. I am afraid that he might state that the church held out their hands to [Nichols] but [Nichols] did not reciprocate and it is for this reason that [Nichols] committed these crimes.

During its questioning of Dr. Engum and again in closing argument, the State argued that this was a lawyer striving to "build a mitigating factor" or "influence the jury"; not a psychological expert presenting an objective opinion of about a defendant's psychological condition.

At the close of evidence and following closing arguments, the court instructed the jury on reaching its verdict and completing a particular verdict form. The court

---

satisfaction of the discovery requirement, rather than forbidding Dr. Engum's testimony.

[24]Note that, ultimately, Dr. Engum did not diagnose Nichols with "irresistible impulse," but rather, diagnosed him with "intermittent explosive disorder."

instructed the jury to reach three decisions and that only a unanimous agreement on each would warrant the death penalty:

> (1)     Whether the State had proven, beyond a reasonable doubt, one or more of the two listed, statutory, aggravating factors (i.e., that the murder occurred during commission of a rape, and that Nichols had convictions for five other rapes);
>
> (2)     Whether the State had proven, beyond a reasonable doubt, that the statutory aggravating factor(s) outweighed the mitigating factors; and
>
> (3)     Whether the punishment should be death.

Importantly, the verdict form also required, after the first question, that the jury write down *which* of the two listed, statutory, aggravating factors they had unanimously found.

After receiving these instructions and retiring for the evening, the jury began the next day, May 12, 1990, and after two hours of deliberation, returned a death sentence, with the following four aggravating factors listed on the verdict form:

> (1)  First degree murder of Karen E. Pulley;
>
> (2)  The unfeeling brutality of the first degree murder of Karen E. Pulley;
>
> (3)  The lack of remorse; and
>
> (4)  The lack of respect of human rights.

The jury also found, expressly and unanimously on the form, that the aggravating factors outweighed, beyond a reasonable doubt, the mitigating factors.

Defense counsel moved for a mistrial on the basis that the State had not proposed or proven those four factors, which were not statutory factors and were, therefore, impermissible. After hearing argument (outside the presence of the jury), the trial court denied the motion and instead re-instructed the jury. Defense counsel moved the court to re-instruct about the mitigating circumstances, but the court declined. The jury returned 15 minutes later with the four prior, erroneous factors crossed out and these two statutory aggravating factors written in:

(1)     The defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person. The State is relying upon the crimes of Aggravated Rape, which are felonies involving the use or threat of violence to the person.

(2)     The murder was committed while the defendant was engaged in committing, or was attempting to commit, or was fleeing after committing or attempting to commit rape.

The jury also found — expressly, unanimously, and beyond a reasonable doubt — that the aggravating factors outweighed, beyond a reasonable doubt, the mitigating factors.

The court then questioned the jury foreperson, asking whether the jury had found that the two statutory aggravating factors had been proven beyond a reasonable doubt *before* they returned the verdict the first time; whether the jurors had assumed they did not need to write those two factors on the verdict form; and whether the reason for that assumption was because they had found the only two factors listed. The jury foreperson answered yes to all three questions. The court then polled the entire jury, asking each juror if he or she had found the statutory aggravating factors beyond a reasonable doubt, had found the two statutory aggravating factors outweighed any mitigating factors, and had made that decision before returning the verdict the first time.[25] Each juror answered yes to each question and both the State and defense counsel declined further polling.

The court dismissed the jury and announced the death sentence. Nichols moved for a new trial (June 11, 1990), amended that motion (November 30, 1990), and amended

---

[25]The court was consistent in questioning each of the 12 jurors, but for three occasions.

In questioning the fourth juror it polled, the court also asked: "And what I stated earlier was correct, that you assumed that since you found both of them you did not have to write those in there? . . . And that's why you made these other explanations?" The juror answered yes to both of these additional questions.

In questioning the sixth juror polled, the court added the "beyond a reasonable doubt" condition to the weighing question, asking: "Did you find that they outweighed beyond a reasonable doubt the mitigating circumstances?" The juror answered yes. The court did not include the "beyond a reasonable doubt" condition in asking the weighing question to any of the other jurors. No one appeared to notice the difference, as it was not mentioned.

In re-questioning the jury foreperson, who was the seventh juror polled, the court also asked: "And I believe the verdict is in your handwriting. . . . So the first part you wrote in, you felt was just a word of explanation of why you did that? . . . But you actually had already found the existence of those two aggravating circumstances?" The juror answered yes to all three of these additional questions; to the third she said, "Definitely, Your Honor."

it again (December 13, 1990).  On December 17, 1990, the trial court heard argument on Nichols's motions for new trial and denied them.  Nichols appealed.

### E.  State Court Appeals

Nichols's trial counsel, Hugh Moore and Rosemarie Bryan, continued to represent him on appeal.  On May 2, 1994, the Tennessee Supreme Court affirmed the death sentence:

> The proof demonstrates [that Nichols] is undoubtedly 'among the worst of the bad,' and clearly belongs among those who are eligible for the ultimate sanction.  [Nichols] was convicted of attempted rape in 1984, served 18 months, was placed on parole, violated it[,] and was returned to prison. He committed five aggravated rapes within 90 days of his rape and murder of Karen Pulley and in three instances was armed with weapons. He prowled the city night after night searching out vulnerable female victims.  Moreover, both [Nichols] and Dr. Engum testified that if released, he would continue to roam and to rape.  At the most, the evidence showed only that [Nichols] had been able to function without violence in a prison setting.  It does not show that the rape and murder of Karen Pulley and the previous rape convictions were aberrations in an otherwise productive life.

*Tennessee v. Nichols*, 877 S.W.2d 722, 739 (Tenn. 1994).  The Tennessee Supreme Court denied rehearing, *Tenn. v. Nichols*, 1994 Tenn. LEXIS 202 at *1 (Tenn. June 20, 1994), and the United States Supreme Court denied certiorari.  *Nichols v. Tenn.*, 513 U.S. 1114 (Jan. 17, 1995).

On December 19, 1995, the Tennessee Court of Criminal Appeals affirmed the five supporting rape convictions (Victims # 5, 7, 11, and 12) and the non-capital sentences in all cases, including Pulley.  *Tenn. v. Nichols*, No. 03C01-9108-CR-00236, 1995 WL 755957 at *19 (Tenn. Ct. App., Dec. 19, 1995).  The trial court later vacated those sentences and re-sentenced Nichols. *See Tenn. v. Nichols*, No. E2008-00169, 2009 WL 2633099 at *2 (Tenn. Crim. App. Aug. 27, 2009).

Meanwhile, on April 25, 1995, Nichols had petitioned the state trial court for post-conviction relief from the Pulley murder conviction.  New attorneys represented Nichols in his state post-conviction motion:  Mary Ann Green, Paul Buchanan, and Don

Dawson. The trial court conducted an extensive evidentiary hearing, in which Nichols's new counsel produced over 20 additional witnesses, though not Nichols himself.[26] On March 18, 1998, the state trial court denied post-conviction relief. Nichols appealed.

On appeal to the Tennessee Court of Criminal Appeals, Nichols raised eleven issues, eight involving ineffective assistance of trial counsel. The appeals court affirmed. *Nichols v. Tenn.*, 2001 WL 55747 at *72 (Tenn. Crim. App. Jan. 19, 2001). The Tennessee Supreme Court granted leave to appeal, particularly the issue of Nichols's Fifth Amendment right against self-incrimination *vis-a-vis* the disclosed psychologist notes, *Nichols v. Tenn.*, 2001 Tenn. LEXIS 551 at *1 (Tenn. July 2, 2001), but affirmed as well. *Nichols v. Tenn.*, 90 S.W.3d 576, 607 (Tenn. Oct. 7, 2002).

### F.  Federal Habeas

Nichols filed his petition for a writ of habeas corpus in federal district court on May 23, 2003. Nichols had a new attorney, Stephen Kissenger. The district court returned the petition for refiling on July 9, 2003, because it had exceeded the page limit. Nichols filed a revised petition raising 34 enumerated claims, many with multiple sub-claims (Aug.18, 2003).

A psychiatric report by David Lisak, Ph.D., University of Massachusetts, dated February 11, 2004, opined that Nichols suffers an "array of traumatic experiences and adverse childhood conditions" that "alter[ed] [his] brain development," and led to "serious, long term psychological, psychiatric, and functional impairments." And a psychiatric report by Faye Sultan, Ph.D, University Psychological Associates (Charlotte, N.C.), dated March 18, 2004, opined that Nichols suffers from intermittent explosive disorder, dissociative disorder, and personality disorder; and was "under the influence

---

[26]The State called Nichols to testify at this hearing but Nichols refused to answer any substantive questions, claiming a constitutional (Fifth Amendment) right against self-incrimination. The trial court ruled that Nichols did not have such a right at the post-conviction stage of the proceedings, but did not require him to answer any questions or hold his refusal against him. On appeal, the Tennessee Court of Criminal Appeals held that Nichols "had no basis to refuse to answer the questions . . . [and] an adverse inference could have been drawn because of [Nichols]'s refusal to answer." *Nichols*, 2001 WL 55747 at *16. The Tennessee Supreme Court disagreed with the appellate court, holding that Nichols properly invoked his right not to answer, but further held that the appellate court's error had not affected the decision. *Nichols v. Tenn.*, 90 S.W.3d 576, 607 (Tenn. 2002).

of serious mental illness" when committing the crimes. On May 5, 2004, Nichols moved the district court to expand the record to add these reports.

In October 2005, additional DNA testing confirmed that Nichols was the source of the spermatozoa samples collected from Karen Pulley's gown. Consequently, in November 2005, Nichols's counsel dismissed several claims that were predicated on his claim of actual innocence or that relied on actual innocence as a cause-and-prejudice exception.

On July 25, 2006, the district court dismissed the petition without a hearing, but granted Nichols a certificate of appealability on seven issues. *Nichols v. Bell*, 440 F. Supp. 2d 730 (E.D. Tenn. 2006). On November 28, 2006, Nichols appealed here and this court subsequently granted Nichols a COA on one additional issue.[27] We address each of these eight issues in turn.

---

[27]In his concurring opinion, *infra*, Judge Martin stresses and condemns the length of the judicial proceedings in this case (i.e., "Nichols'[s] execution was supposed to take place [in] 1994 . . . and [since then] this case has been moving through our justice system . . . providing no closure for the families of the victims."). It is certainly understandable that the general public, including the families of the victims, might question and even condemn the fact that the appellate process in this case — a case in which the defendant confessed and pled guilty — has lasted over 20 years. More particularly, it would be understandable that the general public, including the families of the victims, might question and even condemn the fact that this appeal has sat in the Sixth Circuit, before this panel, for almost seven (7) years. It is somewhat perplexing, however, that Judge Martin would publicize and condemn this situation.

This appeal arrived here on December 1, 2006, and was assigned to this panel on December 5, 2006, with Judge Martin designated as the lead judge, holding primary responsibility for moving the appeal forward. On March 30, 2007, Nichols's counsel moved to expand the certificate of appealability, and that motion was referred to Judge Martin, as the lead judge. The State moved for an extension of time to reply, which Judge Martin granted, and the State eventually filed its reply on April 30, 2007. Judge Martin did not move this appeal forward for over three (3) years.

On May 12, 2010, I advised the panel that I was inclined to grant the motion as to one additional issue and Judge Cook agreed on May 14, 2010. On May 26, 2010, Judge Martin advised that he had misfiled the case and motion, but would retrieve it and reply by June 7, 2010. After receiving no response from Judge Martin for five (5) months, on November 5, 2010, I offered to take the lead on the appeal and file an order granting the motion, based on the concurrence by Judge Cook. Judge Martin agreed on November 10, 2010, and I issued the order that same day.

There followed two motions for extension of time by Nichols and four by the State, all of which were granted, though eventually we ordered that no further extensions would be granted. At no point did Judge Martin object to the grant of any extension of time or urge that the appeal proceed more rapidly. The parties completed their briefing in February 2012 and, considering the availability of the advocates and the judges, oral argument was eventually scheduled for and conducted on January 24, 2013. Since that time, we have been preparing this memorandum opinion.

We agree that the 23 years since conviction in this case appears unreasonably long and, particularly, that the seven-year duration before this court was due in large part to an unjustified period of inactivity. We also recognize that although we did not insist that Judge Martin move this appeal along, much of that inactivity (at least three years' worth) remains directly attributable to him. We think Judge Martin's public denouncement of the delay in completing this appeal is misplaced.

## II.

Because Nichols filed his habeas petition in May 2003, we apply the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104–132, 110 Stat. 1214, codified at 28 U.S.C. § 2254 *et al.* Under AEDPA, we review the last state court decision that adjudicated the merits, to determine whether that decision "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)–(2).

A state court "unreasonably applies" clearly established law when its ruling is "so lacking in justification that [the] error [is] well understood and comprehended in existing law[,] beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. --, 131 S. Ct. 770, 786–87 (2011); *see also Williams v. Taylor*, 529 U.S. 362, 409 (2000) ("objectively unreasonable").

Importantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law . . . [and] [t]his distinction creates a substantially higher threshold for obtaining relief than [would] *de novo* review." *Renico v. Lett*, 559 U.S. 766, 130 S. Ct. 1855, 1862 (2010) (quotation marks and citation omitted). In fact, "[i]t is not necessary . . . to decide whether the [state court]'s decision — or, for that matter, the trial judge's [decision] — was right or wrong. . . . [W]hether the trial judge was right or wrong is not the pertinent question under AEDPA." *Id.* at 1865 n.3. And the possibility that the federal habeas court might "conclude[] in its independent judgment that the [state court] applied clearly established federal law erroneously or incorrectly" is wholly irrelevant. *See Williams*, 529 U.S. at 411. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S. Ct. at 786.

Because "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system," *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003), "AEDPA . . . imposes a highly deferential standard [on the federal courts] for evaluating state-court rulings, and demands that state-court decisions

be given the benefit of the doubt," *Renico*, 130 S. Ct. at 1862 (quotation marks and citation omitted). Even in the case of a summary denial, when the state court has not fully explained the rationale for its decision, the reviewing "habeas court must determine what arguments or theories could have supported the state court's decision; and then it must ask whether it is possible [that] fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior [Supreme Court] decision." *Cullen v. Pinholster*, 563 U.S. -- , 131 S. Ct. 1388, 1402 (2011) (quotation marks and editorial marks omitted).

Moreover, "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity." *Harrington*, 131 S. Ct. at 786 (quotation marks omitted). "The more general the rule at issue — and thus the greater the potential for reasoned disagreement among fair-minded judges — the more leeway state courts have in reaching outcomes in case-by-case determinations." *Renico*, 130 S. Ct. at 1864 (editorial and quotation marks omitted). "[I]t is not an unreasonable application of clearly established [f]ederal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Harrington*, 131 S. Ct. at 786 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (quotation marks omitted)).

"If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786. Indeed, "[s]ection 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. (quotation marks and citation omitted; emphasis added).

### A. *Assistance of Counsel*

Nichols claims he received ineffective assistance of counsel, arguing that his trial counsel did not thoroughly investigate possible mitigating witnesses and, consequently, did not provide the jury with a sufficient mitigation argument. Nichols specifically contends that his trial counsel should have focused on his abusive childhood and called more witnesses to bolster that argument.

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that his counsel's performance was deficient and that it prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance means that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Prejudice means "there is a reasonable probability that, but for counsel's unprofessional errors [i.e., deficient performance], the result of the proceeding would have been different." *Id.* at 694. A habeas petitioner is entitled to relief on an ineffective-assistance claim only if the state court's rejection of that claim was "contrary to, or involved an unreasonable application of" *Strickland*, or rested "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Therefore, the combined effect of *Strickland* and § 2254(d) is "doubly deferential" review. *Pinholster*, 131 S. Ct. at 1403 (citation omitted). Put differently, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

The counsel at issue, Nichols's trial counsel (Hugh Moore and Rosemarie Bryan), presented seven witnesses at the sentencing trial. Nichols's wife, his best friend, and three preachers testified that — but for the rapes and the murder — Nichols was a kind and caring husband and friend, had been a good-natured and religious child, and was sincerely remorseful.[28] Nichols testified also, to emphasize his cooperation with the police, that he had confessed willingly, and that he was sorry. He also testified about his troubled childhood and the uncontrollable, energized feeling that compelled him to rape and murder. Dr. Engum testified about Nichols's troubled childhood, opined that Nichols suffered from "intermittent explosive disorder," and connected the two.

After his conviction and unsuccessful appeals, Nichols obtained new counsel and petitioned the state trial court for post-conviction relief. During eight days of hearings on that petition, Nichols's post-conviction counsel introduced thousands of pages of records and more than 20 witnesses, including family, people from his childhood,

---

[28]One of the preachers, Rev. Butler, also testified about demon possession and offered his belief that, when committing the rapes and murder, Nichols had been under the control of an evil spirit.

preachers, teachers, orphanage workers, jail and prison guards, two psychiatric experts, his trial counsel, and even a sentencing expert.[29]  The theory was that if trial counsel had produced all of these witnesses and had further emphasized Nichols's troubled childhood as a mitigating factor, such an approach would have persuaded the jury to forego the death penalty.  The state trial court was not persuaded, explaining:

> [Nichols's post-conviction counsel] presented numerous relatives and acquaintances at the hearings in this matter to demonstrate the amount and type of mitigating evidence which was not presented at the sentencing hearing in the original trial. . . .  Many of these witnesses, however, were cumulative and only expounded on issues which were raised through the evidence presented by trial counsel at the sentencing hearing, i.e., the evidence was 'substantially similar' to the mitigating evidence previously presented to the jury.  The psychologist retained by post-conviction counsel even testified that while he may have had more personal history in conducting his evaluation, it was essentially the same kind of information Dr. Engum and trial counsel had at the original trial.
>
> The issue of the abusive environment in which [Nichols] grew up was addressed at [Nichols]'s sentencing hearing.  The new witnesses who testified here would thus have been cumulative and the prejudice is not apparent.  In addition, the allegations of sexual misconduct related to [Nichols]'s sister were also raised at the motion for new trial.  It was determined then and on direct appeal that the evidence was additional evidence on the issue of the abusive home environment which already had been raised by the evidence.  Most of the evidence related to these claims was hearsay and it is noted that [Nichols] did not himself testify to these alleged incidents and apparently has no memory of them.  The documents [submitted in post-conviction] also state and the trial court found that [Nichols] and counsel made a diligent effort to find this type of information prior to trial but were unable to find any witness who would state more specific facts about any abuse.  The documents demonstrate that [Nichols] told investigator Cohan that his father disciplined them but not really beyond what he thought was the parental norm.  [Nichols] also told his defense team about the orphanage and stated that he had not been treated badly there.  He even told them about one set of houseparents who considered keeping him when the orphanage was closing but that he was taken back to his father instead.

---

[29]The State called Nichols to testify but Nichols refused to answer any substantive questions. *See* fn. 26, *supra.*

Many of the witnesses testified that they were not contacted and that [Nichols] probably did not know how to contact them. Some witnesses, however, testified that [Nichols] knew how to contact them but that they received no contact and did not step forward on their own. Using 20-20 hindsight[,] more witnesses may have been preferable; based upon all the evidence and documentation, however, this court finds that counsel w[ere] not derelict in their investigation of this case and that no prejudice has been shown. The evidence indicates that many witnesses were unwilling to talk to counsel about many of these matters during the time frame of [Nichols]'s original proceedings [eight years earlier]. Any additional witnesses would for the most part have been cumulative or the weight of their testimony would have been minimal. The aggravator of prior violent felonies was very substantial. It is also noted that this factor could be even more substantial at any resentencing hearing because [Nichols] subsequently pled guilty to additional offenses.

The state appellate court affirmed. Nichols appealed to the Tennessee Supreme Court, which was the last state court to render a decision on this issue.

The Tennessee Supreme Court conducted its own review of the witness testimony from the hearings, reiterated the trial court's findings, and "agree[d] that the evidence in the record supported the trial court's findings and conclusions." *Nichols v. Tenn.*, 90 S.W.3d 576, 598-602 (Tenn. 2002).

[T]he record indicates that trial counsel identified and supported the relevant mitigating themes. The evidence presented at post-conviction did not contest trial counsel's performance in this regard, but rather, second-guessed the quantity of the mitigating evidence and the manner of its presentation. . . .

[I]t appears that any of the evidence at post-conviction which was not cumulative or may have bolstered the evidence presented at trial would not have affected the jury's determination given the strong evidence supporting the prior violent felonies aggravating circumstance. In sum, Nichols has not established a reasonable probability that the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Id*. at 602 (quotation marks and citations omitted). Therefore, the Tennessee Supreme Court, on an independent review of the record, determined that Nichols's trial counsel's

performance was not deficient and, even if it were, Nichols had not shown (or could not show) prejudice.

Upon review of this record, we conclude that the Tennessee Supreme Court reasonably applied *Strickland* and reasonably determined the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). In his briefing here, Nichols's counsel summarizes the post-conviction evidence:

> Witnesses vividly described the isolation and physical, sexual[,] and emotional abuse in the Nichols house; explained in detail how the deaths of his grandmother and mother affected Nichols; described the escalation of abuse by Nichols' father; explained the circumstances of abuse leading to the children's placement in the orphanage; vividly described Nichols' separation from his sister and the 'hellacoius' conditions at the orphanage; discussed Nichols' life after the orphanage with his still-abusive father, the distressing circumstances regarding Nichols' daughter's mother resulting in alienation from his daughter; and, ultimately, his changed disposition.

While the additional testimony may have been more "vivid," "detailed," or "distressing," it was not new — all of these basic facts had been introduced at the original sentencing, albeit in a more perfunctory or cursory manner. This failure to produce or identify any new, previously undiscovered, facts severely undermines the claim that the original investigation was objectively deficient. Moreover, this additional evidence is subject to the same vulnerability that Nichols's original counsel feared at the original sentencing: numerous people — be it his sister, his cousins, or the other orphans — suffered the same, or worse, childhood conditions as Nichols, yet none of them committed serial rapes or murder. We agree with the Tennessee Supreme Court that the additional evidence presented at the post-conviction hearings was ultimately duplicative or merely cumulative of the evidence presented at the original sentencing trial. And we agree that a comparison does not reveal that the additional mitigating evidence is so compelling that there is a reasonable probability that the outcome of the sentencing trial would have been different.

Because our review is "doubly deferential," *Pinholster*, 131 S. Ct. at 1403, we are also mindful that "[i]n assessing deficient performance, reviewing courts must take

care not to second- guess strategic decisions that failed to bear fruit." *Jackson v. Bradshaw*, 681 F.3d 753, 760 (6th Cir. 2012) (citing *Strickland*, 466 U.S. at 689) (quotation marks omitted). Both trial attorneys, Hugh Moore and Rosemarie Bryan, testified in the post-conviction hearings concerning the accusations of deficient performance posed by Nichols's post-conviction counsel.

Hugh Moore answered numerous questions about the decisions made in preparation and performance of the Pulley murder trial. At one point during this testimony, Moore explained:

Question:    Did you make what you feel like was a good attempt to try to get as much mitigation before the jury as possible?

Moore:    To get as much before the jury as possible?

Question:    Yes, sir.

Moore:    I made an attempt to put the very best case I could before the jury, but I'm not sure that putting the very best case before the jury means putting as much evidence before the jury as you possibly can.

Question:    Did - - were you here present when the other witnesses testified the last time that . . . were all pretty much mitigation-type witnesses?

Moore:    I heard some of them.

Question:    All right. Did you - - you did not call any of those that had previously testified here on the two days in this post conviction, did you?

Moore:    No, and I didn't hear a single witness testify that I would have called.

Question:    Okay. So it's your feeling that none of these witnesses added anything?

Moore:    Add anything to - - I mean factually added something?

Question:    Added anything sufficient to the point where you felt like you would have called them had you - -

Moore:    No, no.

Moore reiterated this belief in later testimony, answering, "I don't believe that cumulative evidence is very effective with a jury."

Rosemarie Bryan testified that, in her opinion, the post-conviction witnesses were cumulative to those she and Moore had presented at the original sentencing, and she "thought the damaging testimony from those folks hurt [post-conviction counsel's case] a lot more than how they helped and . . . in front of a jury that would have been much worse." Specifically, she said:

> In my estimation, . . . [those additional witnesses] did no good and would have done no good in the case. Yes, you are absolutely right, you put people on the stand that said things that were not said at [Nichols]'s sentencing phase. Yes, you did. But I do not believe that any of that would have made any difference in the trial. And I believe we put on -- if you had 90 lawyers they'd put on 90 different mitigation phases, they'd put on 90 different sorts of trials. I think we put on the best we could put on under all of the circumstances, and we made some judgment calls not to use some people in the family. And after seeing them here I think I made the right call.

When questioned why she did not further emphasize Nichols's troubled childhood, Bryan answered that, "we made a studied judgment call on that and were afraid that if we pushed it too far . . . it could come back to bite us, yes, and it could not be helpful."

Both trial attorneys defended the challenged performance as a strategic decision or decisions, made based on their training, experience, and the particular circumstances of the case. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010) (quoting *Strickland*, 466 U.S. at 690) (quotation marks and editorial marks omitted). Nichols has not proven that the investigation was not thorough, nor has he proven that the strategic choices were unreasonable.

The state court's resolution of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Nor was the state court decision based on an unreasonable determination of the facts in light of the evidence presented in the post- conviction proceedings. Consequently, Nichols is not

entitled to habeas relief on this claim of ineffective assistance of counsel during the penalty phase of his death penalty proceeding.

### B.  Jury Instruction

Nichols claims that the court improperly required unanimity in finding a mitigating factor because it did not instruct, explicitly and specifically, that unanimity was not required.  Nichols relies on *Mills v. Maryland*, 486 U.S. 367, 370 (1988), in which the Supreme Court held a death sentence unconstitutional because the jurors, attempting to complete the verdict form in a yes-or-no manner, as instructed, thought they were precluded from finding mitigating factors unless they agreed unanimously on the existence of a particular mitigating factor.  Such is not the case here.

In his briefing here, Nichols's counsel asserts that "the instructions and verdict form instructed the jurors to unanimously agree on mitigating factors."  Apt. Br. at 48 (capitalization omitted).  That is simply not true.  The instructions were as follows,[30] with underlining added:

> Tennessee Code Annotated 39-2-203(i) provides that no death penalty shall be imposed by a jury but upon a <u>unanimous</u> finding that the State has proven beyond a reasonable doubt of the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:
>
> (1)  The defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person.
>
> The State is relying upon the crimes of Aggravated Rape, which are felonies involving the use of threat or violence to the person.
>
> (2) The murder was committed while the defendant was engaged in committing, or was attempting to commit, or was fleeing after committing or attempting to commit rape.

---

[30]On its first attempt, the court misread the instructions, omitting the "beyond a reasonable doubt" phrase at certain locations.  After a bench conference and a brief recess, the court read the instructions to the jury a second time, but again omitted the "beyond a reasonable doubt" phrase at certain locations.  The court read the second half of this passage twice more (four total) before getting it entirely correct.  The quoted passage is the final, correct version.

Members of the Jury, the Court has read to you the aggravating circumstances which the law requires you to consider if you are to find beyond a reasonable doubt that the evidence was established. You shall not take account of any other facts or circumstances as the bases for deciding whether the death penalty would be appropriate punishment in this case.

Tennessee Code Annotated 39-13-203(j) provides that in arriving at the punishment, the jury shall consider as heretofore indicated, any mitigating circumstance which shall include, but not be limited to, the following:

(1) The murder was committed while the defendant was under the influence of extreme mental or emotional duress.

(2) The defendant acted under extreme duress.

(3) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect which was insufficient to establish a defense to the crime but which substantially affected his judgment.

(4) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense.

If you <u>unanimously</u> determine that at least one or more statutory aggravating circumstances have been proved by the State, beyond a reasonable doubt, and said circumstance or circumstances outweigh any mitigating circumstance or circumstances beyond a reasonable doubt, the sentence shall be death. The jury shall state in writing the statutory aggravating circumstance or circumstances so found, and signify in writing that the statutory aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances so found, beyond a reasonable doubt.

You will write your findings and verdict upon the enclosed form attached hereto and made a part of this charge. Your verdict should be as follows:

(1) We, the jury, <u>unanimously</u> find the following listed statutory aggravating circumstance or circumstances, beyond a reasonable doubt.

(2) We, the jury, <u>unanimously</u> find that the statutory aggravating circumstance or circumstances so listed above outweigh the mitigating circumstance or circumstances, beyond a reasonable doubt.

(3) Therefore, we, the jury, <u>unanimously</u> find that the punishment shall be death.

The verdict must be *unanimous* and each juror must sign his or her name beneath the verdict.

If you <u>unanimously</u> determine that no statutory aggravating circumstances have been proved by the State beyond a reasonable doubt; or if the jury <u>unanimously</u> determines that a statutory aggravating circumstance or circumstances have been proved by the State beyond a reasonable doubt but that said statutory aggravating circumstance or circumstances did not outweigh one or more mitigating circumstances beyond a reasonable doubt, the sentence shall be life imprisonment. You will write your verdict upon the enclosed form attached hereto and made a part of this charge.

The verdict should be as follows:

We, the jury, <u>unanimously</u> find that the punishment shall be life imprisonment.

The verdict must be <u>unanimous</u> and signed by each juror.

You will have two forms. The first form, Punishment of Death.

(1) We, the jury, <u>unanimously</u> find the following listed statutory aggravating circumstance or circumstances, beyond a reasonable doubt:

(Here list the statutory aggravating circumstance or circumstances so found beyond a reasonable doubt, which shall be limited to those enumerated by the Court for your consideration.)

(2) We, the jury, <u>unanimously</u> find that the State has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances outweigh beyond a reasonable doubt the mitigating circumstance or circumstances.

(3) Therefore, we, the jury, <u>unanimously</u> find that the punishment for the defendant, Harold Wayne Nichols, shall be death.

Then there are twelve places for each juror to affix your signature.

The second form provides Punishment of Life Imprisonment.

We, the jury, <u>unanimously</u> find that the punishment shall be life imprisonment.

And there are twelve spaces for each juror to sign your name to that form.

(underling added).

Contrary to counsel's mischaracterization, neither these instructions nor the verdict form ever required the jurors to agree unanimously on any mitigating factor or factors. A plain reading of these instructions reveals that unanimity was required to find the aggravating factors, unanimity was required to find that the aggravating factors outweighed the mitigating factors, and unanimity was required to impose the sentence, be it death or life imprisonment. But, in stark contrast, unanimity was not required for the mitigating factors — any juror could, in fact was instructed to (i.e., "shall"), consider any mitigating factor, listed or otherwise, and, for the weighing step, mitigating factors were effectively presumed, as there is no requirement that mitigating factors be "found" at all.

Unlike the jury instructions in *Mills*, 486 U.S. at 371, these instructions did not require or even imply that the jury must agree upon the existence of a mitigating circumstance. At most, these instructions omitted an express instruction about the mitigating factors, or as Nichols's counsel put it in his briefing, "[n]o instruction told the jury what to do if some but not all of the jurors believed that a mitigating factor existed." As an aside, we do not agree that the absence of an express instruction left the jury without guidance in this circumstance — the instructions required each juror to consider any mitigating factor, listed or otherwise, in its weighing calculus. That is, if some but not all of the jurors (or even a single juror) found the existence of a mitigating factor, the instructions required those jurors (or that juror) to weigh it against the aggravating factors, albeit only considering those aggravating factors that had been unanimously agreed upon.

Regardless, based on our review and the foregoing passage, we find that with regard to mitigating factors, these instructions contain no express requirement of unanimity — that is, they omit any requirement of unanimity. And, as we have previously held, "the only reasonable reading of [such] instruction [i]s that, by omission, no unanimity [i]s required." *See Coe v. Bell*, 161 F.3d 320, 338 (6th Cir. 1998) (citing *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1121 (6th Cir. 1990) (en banc)).

The state court's resolution of this claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. Nor was the state court decision based on an unreasonable determination of the facts. Consequently, Nichols is not entitled to habeas relief on this claim of improper jury instructions during the penalty phase of his death penalty proceeding.

### C. Verdict Form

Nichols claims that the jury's error in completing the verdict form was actually an error in reaching its decision, which was uncorrectable, invalidated the original verdict, and, consequently, necessitated a mistrial. There is no dispute that the jury erred in completing the verdict form; the question is whether the court's ruling or response was an unreasonable application of clearly established constitutional law. *See* 28 U.S.C. § 2254(d)(1); *Harrington*, 131 S. Ct. at 786.

As detailed in the foregoing section, the court thoroughly instructed the jury on making its sentencing decision and completing the verdict form. The court specified that the jury had three decisions and that only a unanimous agreement on each would warrant the death penalty:

(1)     Whether the State had proven, beyond a reasonable doubt, one or more of the listed, statutory, aggravating factors;

(2)     Whether the State had proven, beyond a reasonable doubt, that the statutory aggravating factor(s) outweighed the mitigating factors; and

(3)     Whether the punishment should be death.

After two hours of deliberation, the jury returned a unanimous verdict — on a form signed by all 12 jurors — answering affirmatively each of these three questions. But the verdict form also required, after the first question, that the jury write down which listed, statutory, aggravating factors they had unanimously found. And this is the jury's error: in completing this portion of the prescribed form, the jury foreperson did not write down either of the listed, statutory, aggravating factors (i.e., the prior violent crimes of rape

or that the murder was committed as part of perpetrating a rape); instead, the jury foreperson wrote down (and the other jurors signed on to) the following four factors:

> (1)  The first degree murder of Karen Pulley;
>
> (2)  The unfeeling brutality of the first degree murder of Karen Pulley;
>
> (3)  Nichols's lack of remorse; and
>
> (4)  Nichols's lack of respect for human rights.

The court had not instructed the jury on any of these four factors, nor were they listed on the written charge sent to the jury room. These were the jury's own creation. But, notably, the jury did not reject the two listed aggravating factors, expressly or otherwise. In fact, the jury foreperson explained to the court later that the jury had found that the State had proven the two statutory aggravating factors but had mistakenly assumed that those were not the factors to be written on the form, and instead thought, apparently, that the form was asking them to supply additional reasons. So the court had a death verdict in which the jury found unanimously, beyond a reasonable doubt, that the State had proven aggravating factors, that the aggravating factors outweighed the mitigating factors, and that death was the proper sentence. But in the part of the form explaining its decision, the jury had listed the wrong aggravating factors and had failed to list the right ones. The court assumed — correctly, as was confirmed in colloquy with the jury foreperson — that the jury agreed on the listed, statutory, aggravating factors, but had misunderstood the requirement that they copy those same listed factors onto the verdict form.

Defense counsel moved for a mistrial on the basis that the State had not proposed or proven the four new factors, which were not statutory factors, and argued further that those non-statutory factors were impermissible. After hearing argument (outside the presence of the jury), the trial court denied the motion and instead re-instructed the jury to re-complete the form. The jury returned 15 minutes later with the four non-statutory factors crossed out and the two listed, statutory, aggravating factors written in. In the returned verdict, the jury again found — expressly, unanimously, and beyond a

reasonable doubt — that these aggravating factors outweighed the mitigating factors and, therefore, the appropriate punishment would be death.

As a factual matter, the Tennessee Supreme Court determined that, as part of its original verdict, the jury had found that the State had proven the statutory aggravating factors, even though they had failed to write those factors on the verdict form, explaining:

> [T]he jury originally had not listed these two circumstances because it had assumed it need not copy statutory aggravating circumstances on the form.  Each juror answered affirmatively when asked by the court whether, before reporting the verdict the first time, he or she had found (1) that each of the two statutory aggravating circumstances had been proved beyond a reasonable doubt, and (2) that these circumstances outweighed any mitigating circumstances.

*Tennessee v. Nichols*, 877 S.W.2d 722, 730 (Tenn. 1994).  Based on our careful review of the record, this is a perfectly reasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(2).

From this, the Tennessee Supreme Court held that the initial verdict was legal and valid, despite the error in the verdict form, and affirmed the trial court's refusal to grant a mistrial.  *Nichols*, 877 S.W.2d at 730-31.  The court held, as a matter of state law, that, "[w]hen the jury reports an incorrect or imperfect verdict, the trial court has both the power and the duty to redirect the jury's attention to the law and return them to the jury room with directions to reconsider their verdict."  *Id.* at 730 (citing *Tennessee v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993)).  The court further held that the four additional factors, though non-statutory, were "factors the jury may consider under the [Tennessee murder-sentencing] statute."  *Id.* at 731 (citing Tenn. Code Ann. § 39-13-204(c)).

As a matter of federal constitutional law, the court cited *California v. Ramos*, 463 U.S. 992 (1983), *Barclay v. Florida*, 463 U.S. 939 (1983), and *Zant v. Stephens*, 462 U.S. 862 (1983), to support its holding that the United States Constitution would not forbid the jury from considering those additional four factors.  In *Zant*, 462 U.S. at 878,

the Supreme Court explained that "statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death." In *Barclay*, 463 U.S. at 950, the Supreme Court said: "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether or not death is the appropriate punishment." We have no difficulty concluding that the Tennessee Supreme Court reasonably applied this precedent.

In his briefing here, Nichols's counsel points to *Stringer v. Black*, 503 U.S. 222, 232 (1992), as a constitutional prohibition against a capital jury's creation of its own aggravating factors and, therefore, contends that the Tennessee Supreme Court's ruling was contrary to or an unreasonable application of this clearly established law. We find that *Stringer* does not stand for any such proposition. The jury in *Stringer* did not create any aggravating factors of its own; rather, the state legislature defined the factors, the court charged the jury with them, and the jury considered and decided them as charged. *Stringer*, 503 U.S. at 226. When Stringer's counsel argued that one of the factors defined and charged was unconstitutionally vague, the Supreme Court agreed, concluding that the "[u]se of a vague or imprecise aggravating factor" was problematic. *Id*. at 237. In the present case, the court charged the jury with two explicit, statutory, aggravating factors, which were neither vague nor imprecise. The error here was not due to any vague or imprecise language in the charged aggravating factors, the error was due to the jury's misunderstanding of how to complete the verdict form. Consequently, *Stringer* is inapposite to the present issue and circumstances.

Neither *Stringer* nor any of the other cases cited in Nichols's brief demonstrate that the state trial court's decision to send the jury back to correct the verdict form was contrary to or an unreasonable application of any federal law. Nichols is not entitled to relief on this claim.

### D. Jury Re-Instruction

Nichols claims that, rather than re-instructing the jury to clarify the verdict form, the trial court ordered a death sentence: i.e., "the court directed a death verdict"; "[t]he judge instructed the jury to disregard mitigating evidence"; and "the jury wasn't allowed to consider mitigating evidence." Apt. Br. at 76-77. These claims are not true. The trial court began from the premise — which the Tennessee Supreme Court properly affirmed, as explained in the foregoing section — that the jury had already announced its verdict, and re-instructed it as follows about the form:

> Jurors, Tennessee Code Annotated 39-2-203(i) provides that no death penalty shall be imposed by a jury but upon a unanimous finding that the State has proven beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances, which shall be limited to the following:
>
> (1)  The defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person.
>
> (2) The murder was committed while the defendant was engaged in committing, or was attempting to commit, or was fleeing after committing or attempting to commit rape.
>
> Members of the jury, the Court has read to you the aggravating circumstances which the law requires you to consider if you find beyond a reasonable doubt that the evidence was established. You shall not take into account of any other facts or circumstances as the bases for deciding whether the death penalty would be appropriate punishment in this case.[31]
>
> The form for Punishment of Death.
>
> (1) We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances beyond a reasonable doubt:
>
> (Here list the statutory aggravating circumstance or circumstances so found, which shall be limited to those enumerated by the Court for your consideration.)

---

[31]As was explained in the foregoing section, both Tennessee and federal law permit a jury to consider additional aggravating factors, so this instruction was not a correct statement of either law. Consequently, if the jury erred by failing to abide by this particular instruction, such error would not be cognizable on habeas review as a violation of federal law.

> And then there is a space for the jury to fill in the statutory aggravating circumstance.

> The jury can take the Court's charge and retire back to the jury room.

Defense counsel urged the court, both before and after the re-instruction, to re-instruct the jury on mitigating factors also, but the court refused, explaining that "they have [already] found that he is guilty." That is, the trial court was not instructing the jury to reconsider its verdict or any aspect of it; the trial court was accepting that the jury had already reached and announced a verdict, and was merely instructing the jury to clarify on the form that they had properly considered — and found that the State had proven — the statutory aggravating factors.

On direct appeal, the Tennessee Supreme Court affirmed this succinctly, based on its earlier holding — which we approved in the foregoing section — that "the initial verdict was a legal verdict and the jury had a right to correct it under proper instruction." *Nichols*, 877 S.W.2d at 735. Accordingly, "[t]here was no reversible error in the failure to recharge the mitigating circumstances or to include the words 'beyond a reasonable doubt' in the questions asked the jurors." *Id*.

Nichols contends that the court was required to instruct the jury to reconsider whether it found the statutory aggravating factors and, if so, to re-weigh those aggravating factors — without considering the improper aggravating factors — against the mitigating factors, as though it had never reached the first verdict. The district court identified the controlling law on this issue:

> The [petitioner's] burden of demonstrating that an erroneous [jury] instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned.

*Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (footnotes, quotation marks, and citations omitted).  The district court also elaborated on the applicable facts and circumstances, analyzed this claim under that law, and found no such prejudice from this particular instruction:

> [T]he sworn jury was initially properly and fully instructed on mitigating factors and weighing aggravating and mitigating factors.  The jury was initially given the requested mitigating instructions and the written instructions were in the jury room during deliberation.  This is not a case where the jury was not instructed or not properly instructed on fixing punishment, at least initially after several corrected instructions.  The polling of the jury reveals [Nichols] did not suffer any prejudice due to the trial court's failure to re-instruct on the mitigating circumstances.
>
> Significantly, the trial court sent the written instructions to the jury during its initial deliberations, and nothing in the record reveals that the jury did not have them when it returned for further deliberations.  [Nichols]'s trial attorneys argued the mitigating evidence and asked the jury to sentence him to life based on that evidence. Moreover, the State presented strong aggravating evidence, as shown by the relatively short period of deliberation.  [Nichols] raped and murdered the victim; after committing that crime, [Nichols] violently raped several other women; and [Nichols] admitted he was guilty of the felony-murder and of several other rapes.
>
> [T]he jury was required to decide whether to sentence [Nichols] to life imprisonment or death.  Evaluating the jury instructions as a whole, it is clear the jury was initially fully and properly instructed on mitigating evidence and how to weigh it against the aggravating circumstances.  There was no evidence of jury confusion in relation to mitigating evidence and the weight to accord it but rather, the confusion was on what aggravating circumstances to list on the death verdict [form].

*Nichols v. Bell*, 440 F. Supp. 2d 730, 804-05 (E.D. Tenn. 2006) (footnotes omitted).

Nichols cannot show that the state trial court's failure to re-instruct the jury on mitigating factors was so prejudicial that his conviction violates due process.  Nor can Nichols show that the state court decision was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts.  Nichols is not entitled to relief on this claim.

### E.  Polling the Jury

Nichols claims that the trial court's post-verdict polling of the jury, after it had resubmitted the corrected verdict form, comprised questions that: (1) misstated the law, in that they did not specifically ask whether each juror had found each decision "beyond a reasonable doubt"; and (2) were coercive, in that they "were calculated to elicit an affirmative response to give legitimacy to an otherwise illegal verdict."  The State responds that, even assuming these questions were thus flawed, Nichols cannot point to any Supreme Court case law holding that the trial court must conduct post-verdict polling in a particular manner, because there is no such holding.

Recall that when the jury returned its corrected verdict form, the jury foreperson had crossed out the four non-statutory factors and written in the two statutory aggravating factors.  The form also stated the jury's finding, beyond a reasonable doubt, that the aggravating factors outweighed the mitigating factors and that the death penalty was the appropriate sentence.

The court questioned the jury foreperson, asking whether the jury had found — *before* they returned the verdict the first time — that the State had proven the two statutory aggravating factors beyond a reasonable doubt; whether the jurors had mistakenly assumed that those were not the factors to be written on the verdict form; and whether the reason for that assumption was because they had found the only two factors listed.  The jury foreperson answered yes to all three questions.  The court then polled the entire jury individually, asking each juror if he or she had found the statutory aggravating factors beyond a reasonable doubt, had found the two aggravating factors outweighed any mitigating factors, and had made that decision before returning the verdict the first time.[32]  Each juror answered yes to each question.

As discussed in the two foregoing sections, the Tennessee Supreme Court began its analysis of this issue from its holding that "the initial verdict was a legal verdict," and

---

[32]The court was consistent in questioning each of the jurors, but for three occasions.  *See* fn. 25, *supra*.

concluded that "[t]here was no reversible error in the failure to . . . include the words 'beyond a reasonable doubt' in the questions asked the jurors." *Nichols*, 877 S.W.2d at 735.  The court also elaborated on its reasoning:

> This issue is essentially a challenge of the verdict's reliability.  In this respect, it should be noted, first, that the jurors were instructed that they must find that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt and, second, that the verdict form itself states that the jury unanimously found that the statutory aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt.  The court was only ascertaining that this was the jurors' verdict and its omission of the phrase 'beyond a reasonable doubt' in this question during the polling does not invalidate an otherwise valid verdict.

*Id*. at 736.

In his briefing here, Nichols cites three cases as putative Supreme Court precedent — *Brasfield v. United States*, 272 U.S. 448 (1926), *Lowenfield v. Phelps*, 484 U.S. 231 (1988), and *Maynard v. Cartwright*, 486 U.S. 356 (1988) — but each is significantly off point.  *Brasfield*, 272 U.S. at 449, stands for the proposition that a trial court may not "inquir[e] of a jury, unable to agree, the extent of its numerical division."  Here, the jury had already agreed and the court made no such inquiry.  *Lowenfield*, 484 U.S. at 241, stands for the proposition that a trial court may inquire of a jury, unable to agree, whether further deliberation would enable them to arrive at a verdict.  Here, the jury had already agreed, and the court made no such inquiry.  Finally, *Maynard*, 486 U.S. at 360, stands for the proposition that statutorily prescribed death-qualifying aggravating factors must not be vague, arbitrary, or capricious.  *Maynard* says nothing whatsoever about post-verdict polling of a jury.  None of these cases provides clearly established precedent on this particular point.

In its analysis, the district court quoted from an unpublished Sixth Circuit case for the guiding purpose behind post-verdict jury polling.  *See Nichols*, 440 F. Supp. 2d at 807-08.  To wit:

> The purpose of [post-verdict] polling is to ascertain that each juror approves of the verdict and has not been coerced or induced to concur in a verdict to which he or she does not fully assent. [Post-verdict] [p]olling gives effect to each juror's right to change his or her mind about the verdict agreed to in the jury room even though the likelihood of such change is remote. If the trial court decides to poll the jury at all, it has substantial discretion in determining the manner of polling.

*Dunaway v. Moore*, 78 F.3d 584, 1996 WL 102425, *7 (6th Cir. 1996) (table) (citing *U.S. v. Miller*, 59 F.3d 417, 419 (3d Cir. 1995), *Audette v. Isaksen Corp.*, 789 F.2d 956, 958 (1st Cir. 1986)).

Considering all of the facts and circumstances of this case, the combination of the jury's initial jury verdict, the re-instruction, and the post-verdict polling, Nichols has not demonstrated that the state court decision was based on an unreasonable determination of the facts in light of the evidence, or that the state court decision was contrary to or an unreasonable application of any clearly established federal law. Nichols is not entitled to habeas relief on this claim.

### F. Order of the Trials

Nichols claims the State violated his rights to due process, equal protection, or the Eighth Amendment by prosecuting later-occurring crimes first, rather than trying them chronologically in the order he committed the crimes (i.e., Pulley first), in order to create prior-violent-felony convictions to qualify him for the death penalty. The State responds that, even assuming the factual predicates, Nichols cannot point to any Supreme Court holding that requires the State to prosecute offenses in chronological order to avoid prior convictions, because there is no such holding.

The Tennessee Supreme Court analyzed this claim under both Tennessee state law and federal constitutional law, and rejected it outright:

> As a result of the serial rapes, [Nichols] faced forty [40] charges growing out of some fourteen [14] incidents. The murder of Karen Pulley occurred during the first such incident. The trial court denied [Nichols]'s motion to have the cases tried in chronological order. . . . [Nichols] contends that allowing a prosecutor the discretion to

orchestrate a series of trials in this fashion constitutes cruel and unusual punishment and violates due process and equal protection.  He particularly claims that such discretion results in arbitrary and capricious imposition of the death penalty contrary to the principles of *Furman v. Georgia*, 408 U.S. 238 (1972).

Tenn. Code Ann. § 39–13–204(i)(2) provides that the death penalty may be imposed where the defendant was previously convicted of one or more felonies other than the present charge, whose statutory elements involve the use of violence to the person.  For purposes of this aggravating circumstance, the order in which the crimes were actually committed is irrelevant so long as the convictions have been entered before the sentencing hearing at which they were introduced.

It goes without saying that the implementation of this aggravating circumstance may be subject to a certain degree of prosecutorial discretion; but implementation of the criminal laws against murder necessarily requires discretionary judgments. *McCleskey v. Kemp*, 481 U.S. 279, 299 (1987).  Prosecutorial discretion of this nature does not offend the Eighth Amendment under *Furman*, which 'held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the criminal.' *Gregg v. Georgia*, 428 U.S. 153, 199 (1976). Where this fundamental discretion is involved, it will not be assumed that 'what is unexplained is invidious,' *McCleskey v. Kemp*, 481 U.S. at 309, and 'exceptionally clear proof' is required before an abuse of discretion will be found in the operation of the criminal justice process. *Id.* at 299.  No such showing has been made in this case.  We further find that the record does not support [Nichols]'s assertion that the prosecutor's decision concerning the order of prosecution of the multiple charges facing [Nichols] violated either equal protection or due process. Accordingly, we find no merit in this issue.

*Nichols*, 877 S.W.2d at 735-36 (certain quotation marks, editorial marks, and citations omitted).

The district court echoed this reasoning and added its own analysis concerning the application of Supreme Court precedent, finding no support for Nichols's claim:

Under Tennessee law, the language in the statute, 'previously convicted,' has been defined as clearly indicating that the date of conviction, not the date of the commission of the crime, is the important factor.  The order in which the crimes were actually committed is

irrelevant, as long as the convictions have been entered before the sentencing hearing at which they are introduced. Tennessee law requires that the State prove prior criminal convictions, not prior criminal activity.

Although [Nichols] claims the prosecutor's decision to try the cases out of chronological order was done so as to create an aggravating circumstance of prior violent felony convictions, violating his right to equal protection and due process, [Nichols] has not pointed to a United States Supreme Court case which holds that it is unconstitutional for a prosecutor to try cases out of chronological order for the purpose of obtaining evidence for the prior felony aggravating circumstance for a death penalty trial. In *Tuilaepa v. California*, 512 U.S. 967 (1994), the Supreme Court did find that states are permitted to focus the jury's attention on a capital defendant's prior criminal record. The issue in *Tuilaepa* was the constitutionality of an aggravating circumstance which permitted the sentencer to consider the defendant's prior criminal activity. Although the challenge was based on the allegation that the circumstance was unconstitutionally vague, the Supreme Court explained that the circumstance rested in part on a determination whether certain events occurred, thus requiring the jury to consider matters of historical fact. The *Tuilaepa* Court pointed out that 'both a backward-looking and a forward-looking inquiry are a permissible part of the sentencing process' and states have considerable latitude in determining how to guide the sentencer's decision in this respect. *Id*. at 976–77. [Nichols]'s jury was permitted to conduct a backward-looking and forward-looking inquiry when looking at the prior convictions for crimes committed after the murder; and [Nichols] has not directed th[is] [c]ourt's attention to any United States Supreme Court law prohibiting this.

*Nichols*, 440 F. Supp. 2d at 837 (certain quotation marks, editorial marks, and citations omitted).

In his briefing here, Nichols cites four Supreme Court cases as precedent that, he contends, the Tennessee courts applied unreasonably: *Gregg v. Georgia*, 428 U.S. 153 (1976), *Roberts v. Louisiana*, 428 U.S. 325 (1976), *Woodson v. North Carolina*, 428 U.S. 280 (1976), and *Furman v. Georgia*, 408 U.S. 238 (1972). These cases stand for the broad proposition that the trial court must direct the jury to consider the individual characteristics of the crime and the criminal, so as to limit the jury's discretion and ensure that it does not impose the death penalty in an arbitrary or capricious manner. None of these cases concerns the State's role in prosecuting multiple crimes or proving aggravating factors in support of the death penalty. It is telling, however, that the

aggravating factor at issue — i.e., Nichols's perpetration of multiple additional violent rapes — is certainly a characteristic of the criminal, and a very significant one. When considering Nichols's individual character and his suitability for the death penalty, the fact that Nichols committed these additional crimes would be critical to the jury's individualized assessment, whether he committed them prior to the murder, after the murder, or even in the courthouse hallway just prior to sentencing. The fact that Tennessee requires "conviction" rather than merely accusation does not change the importance of this information to the jury's consideration, it merely protects Nichols's right to be presumed innocent prior to conviction and accepts that he has been proven guilty after conviction. As the Tennessee Supreme Court explained, it is the commission of the crimes that matters; "the order in which the crimes were actually committed is irrelevant so long as the convictions have been entered before the sentencing hearing at which they were introduced." *See Nichols*, 877 S.W.2d at 735-36.

The Tennessee Supreme Court reasonably relied on *McCleskey v. Kemp*, 481 U.S. 279 (1987), for its proposition that the prosecutor has wide discretion in pursuing the death penalty, and that nothing in *Furman* or *Gregg* contradicted this discretion. *See Nichols*, 877 S.W.2d at 736. The district court relied on *Tuilaepa v. California*, 512 U.S. 967, 976-77 (1994),[33] for its proposition that the jury can properly "consider the defendant's prior criminal activity" in deciding on the death sentence, and that "[b]oth a backward-looking and a forward-looking inquiry [into a defendant's criminal characteristics] are a permissible part of the sentencing process." This precedent further refutes Nichols's argument that the State violated the Constitution by prosecuting his later-occurring crimes first so that it could create prior-violent-felony convictions. Finally, it bears express mention that the Tennessee statute lists the death-qualifying factor as prior "conviction" of violent crime, not prior "commission" of violent crime. Presumably, the Tennessee legislature recognizes the difference, and the Tennessee courts were not unreasonable in interpreting the statute as written.

---

[33]The Supreme Court published *Tuilaepa* on June 30, 1994, almost eight weeks after the Tennessee Supreme Court published the *Nichols* decision (May 2, 1994), so *Tuilaepa* was not guiding precedent at the time of the *Nichols* decision. It does indicate, however, that the *Nichols* Court was correct in its general assessment of the precedent.

Nichols has not demonstrated that the state court decision was based on an unreasonable determination of the facts or that the decision was contrary to or an unreasonable application of any clearly established Supreme Court law.  Nichols is not entitled to habeas relief on this claim.

### G. "Non-Final" Prior Convictions

Nichols claims that the prior-violent-felony convictions (i.e., the other rape convictions) were not "prior" convictions because they were not technically "final" under Tennessee Rule of Criminal Procedure 32(e) at the time of the Pulley murder trial, because the trial court had not imposed sentence on those convictions or entered formal judgments of conviction.  Notably, the court had not sentenced Nichols on any of those convictions because Nichols's counsel had moved the court to stay the sentencing until after the completion of the other guilt-phase determinations, specifically until after the Pulley murder trial.  The court granted the motions and did not sentence Nichols on any of the non-capital convictions until December 13 and 14, 1990.

The Tennessee Supreme Court decided this issue as a matter of state law, holding that the aggravating-factor statute, Tenn. Code Ann. § 39-13-204(i)(2), requires only a "previous convict[ion]," not a final judgment; that "the indictments and minutes of the trial court [that the State] offered to prove these convictions[,] were admissible under either Tenn. R. Evid. 803(b) (Records of Regularly Conducted Activity) or 893(8) (Public Records and Reports)"; and that "the convictions were [therefore] admissible." *Nichols*, 877 S.W.2d at 737.  The district court recognized that Nichols had challenged only state law and found this claim procedurally defaulted:

> [Nichols] failed to raise this claim in his habeas petition or in state court on constitutional grounds. . . . 'The habeas petitioner must present his claim to the state courts as a federal constitutional issue — not merely as an issue arising under state law.' *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  Although [Nichols] stated, in his state appellate brief, 'to allow the use of these cases as 'final convictions' was error and violated Mr. Nichols' rights under the Fourth, Fifth, Sixth, and Eighth Amendments to the United States Constitution . . .', these general allegations of denial of these broad constitutional rights does not constitute a fair presentation of the claim that specific constitutional

rights were violated. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). The factual and legal basis for a constitutional claim must be presented to the state courts. Without specifying which particular right identified under each amendment was violated, [Nichols] failed to fairly present this claim as a constitutional violation in the Tennessee courts. On direct appeal[,] [Nichols] did not rely upon any federal cases employing constitutional analysis; [rely] upon any state cases employing federal constitutional analysis; phrase the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or allege facts were within the mainstream of constitutional law. *See Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987).

Consequently, [Nichols] has procedurally defaulted his claim that the trial court erred when it allowed the prosecution to use his prior convictions as aggravating circumstances to support the death penalty. . . . *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). [Nichols] did not present the claim in state court as a matter of federal law and absent a showing of cause and prejudice or miscarriage of justice, the claim is not reviewable in this habeas proceeding. [Nichols] has offered nothing to demonstrate cause and prejudice. Moreover, [Nichols] has failed to allege a violation of any constitutional right in this habeas petition.

Assuming for the sake of argument that this claim was exhausted, [Nichols] would [still] not be entitled to any habeas relief because he has not demonstrated that the state court decision was contrary to, or an unreasonable application of, federal law. Thus habeas review of this claim is barred by [Nichols]'s state procedural default and it will be DISMISSED.

*Nichols*, 440 F. Supp. 2d at 838-39 (editorial marks omitted).

In his initial briefing here, Nichols completely ignored the district court's finding of procedural default, whereas in his reply brief he protested that he had cited to "the Fourth, Fifth, Sixth, and Eighth Amendments to the United States Constitution" in his brief to the Tennessee Supreme Court, but again ignored the district court's explanation as to why that was insufficient. In short, Nichols has offered us no basis upon which to reverse the district court's finding of procedural default and we find none ourselves. Nichols has defaulted this claim.

Moreover, we agree with the district court that, even if Nichols had properly raised this claim, he has not demonstrated that the state court decision was contrary to

or an unreasonable application of clearly established federal law.**34** Nichols is not entitled to habeas relief on this claim.

### H. Disclosure of Expert Psychologist's Notes

Nichols claims that the state trial court violated his constitutional right to a fair trial by forcing the defense to disclose the expert psychologist's (i.e., Dr. Engum's) notes to the prosecution.**35** The State responds that Nichols did not raise this claim in the state courts as a constitutional violation and has, therefore, procedurally defaulted this claim. The State correctly points out that Nichols's primary argument to the state courts concerned the Tennessee discovery rules and his secondary argument concerned the attorney work-product doctrine, neither of which is cognizable on federal habeas review because neither is a federal constitutional issue. But, as Nichols points out, he did assert a constitutional claim in his brief to the Tennessee Supreme Court, albeit vaguely, claiming: "The production of all of Dr. Engum's preliminary internal notes and memoranda, . . . and the use by the State of those notes to ridicule defense witnesses and to condemn the defense strategy, was prejudicial error, and a violation of [Nichols]'s rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution . . . ."

---

**34**We would perhaps be remiss if we failed to note the applicability of the of the invited-error doctrine. Under the doctrine, "a party may not complain on appeal of errors that he himself invited or provoked the court to commit." *United States v. Wells*, 519 U.S. 482, 488 (1997) (editorial and quotation marks omitted) (citing *United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir.1993), and *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir.1991)). The reason the state trial court had not sentenced Nichols on any of those convictions was because Nichols's counsel had moved the court to stay the sentencing until after the completion of the other guilt-phase determinations, specifically until after the Pulley murder trial. Therefore, if this were error, it would be error invited by Nichols's counsel.

**35**In his briefing here, Nichols also claims that this alleged error was due to the ineffective assistance of his trial counsel. Nichols raised a similar ineffective-assistance claim to the Tennessee Supreme Court in his appeal from the state post-conviction proceedings, and that court affirmed the denial of the claim as meritless. Nichols raised an ineffective-assistance claim in his § 2254 petition, but later expressly withdrew that claim. The district court relied on that withdrawal to deny the claim. *Nichols*, 440 F. Supp. 2d at 797 ("This claim is withdrawn by petitioner . . . . Accordingly, petitioner is not entitled to any habeas relief on this claim."). But for certain narrow exceptions, we do not review claims that were not properly presented in the district court. *See Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993); *Bason v. Yukins*, 328 F. App'x 323, 324 (6th Cir. 2009). Moreover, Nichols did not obtain a COA for this issue, which further counsels against our review. *See Hartman v. Bagley*, 492 F.3d 347, 371 n.1 (6th Cir. 2007). Accordingly, we decline to consider this aspect of the claim on appeal and summarily affirm the district court's denial.

The Tennessee Supreme Court did not address this constitutional claim (and the district court denied it as having been procedurally defaulted). "Claims that were not adjudicated on the merits in [s]tate court proceedings receive the pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact), and clear error for questions of fact." *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011) (quotation marks omitted). We review this claim *de novo*.

The question — as preserved by Nichols's state court claim — is whether the State prosecutor's questions and comments, based on Dr. Engum's notes, "so infected the trial with unfairness as to make the resulting [decision] a denial of due process." *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks omitted). In the Sixth Circuit, we have established a two-step test for analyzing such prosecutorial-misconduct claims:

> First, this court determines whether the prosecution's conduct or remarks were improper. If the answer is affirmative, then the court considers four factors to decide whether the improper acts were sufficiently flagrant to warrant reversal: (1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally.

*Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). We must also be mindful that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

In his briefing here, Nichols quotes several questions or comments made by the State prosecutor during the sentencing trial, but argues specifically only that "prosecutorial suggestions that the defense was misleading or fooling the jury violated Nichols' constitutional rights." We consider this claim under the aforementioned two-step test.

Recall that Dr. Engum is a psychologist and a lawyer who testified as a psychological expert for the defense.  Dr. Engum diagnosed Nichols with "intermittent explosive disorder," a type of "impulse control disorder" in which Nichols's "ability to resist [wa]s overwhelmed."  Dr. Engum found no organic brain injury and attributed his diagnosis to "psychosocial factors," such as the "punitive, hostile environment" in which Nichols was raised, his abusive father, abandonment, lack of love or empathy, estrangement, and his being socially isolated.  Dr. Engum was careful to note his opinion that Nichols had been aware of the wrongfulness of his actions though unable to control them, but also emphasized that Nichols was remorseful afterwards.

On cross-examination, the State used Dr. Engum's notes to impeach his testimony and portray him as a defense team lawyer, not an independent psychologist, who was actively trying to persuade the jury.  For example, the State brought out that, in his correspondence with defense counsel, Dr. Engum repeatedly referred to "us" and "we" as though he were part of the defense team, such as in the statement:  "Joanne provides a wealth of information which I believe will help us at least support an argument for the irresistible impulse defense."[36]  Moreover, concerning potential defense witness Rev. L. E. Butler, Dr. Engum wrote to defense counsel:

> Reverend Butler is the type of individual that I characterize [as] the limited public figure.  He would probably protest all the way to the stand and then revel and bask in the notoriety of his testimony.  I believe that his testimony could also be fairly powerful.  As we have discussed, we are trying to build a mitigating factor of irresistible impulse[37] . . . .  Reverend Butler can add to the persuasiveness of this argument by recasting the irresistible impulse into possession by the devil.  This may have a great impact and influence upon those members of the jury with religious leanings. . . . The only negative note that he might bring is with regard to [Nichols]'s choice to let the devil into his heart.  Reverend Butler also states that if only [Nichols] had chosen to come back into the church, none of this would have happened.  Hence, we need to be very careful that Reverend Butler does not recast this 'possession theme' into

---

**36**Note that, ultimately, Dr. Engum did not diagnose Nichols with "irresistible impulse," but rather, diagnosed him with "intermittent explosive disorder."

**37***See* fn. 36, *supra*.

an active, voluntary, knowing choice. I am afraid that he might state that the church held out their hands to [Nichols] but [Nichols] did not reciprocate and it is for this reason that [Nichols] committed these crimes.

During its questioning of Dr. Engum and again in closing argument, the State argued that this was a lawyer striving to "build a mitigating factor" or "influence the jury"; not a psychological expert presenting an objective opinion of about a defendant's psychological condition.

The first step of our inquiry is to determine whether the State's questions or comments were improper. *See Slagle*, 457 F.3d at 516. Given that the State was merely confronting Dr. Engum with his own writings and that the inference being suggested from those writings — that Dr. Engum was attempting to fool or mislead the jury by purporting to be an independent expert while, in reality, acting as a member of the defense team trying to persuade them against a death sentence — was not unreasonable under these facts, we do not find these questions or comments improper in this circumstance. But even if we were to find these questions or comments improper, we would not find them sufficiently flagrant to warrant reversal under the second step of the inquiry. *See id.*

The evidence of the aggravating factors — both that Nichols committed the murder as part of a rape and that he had been convicted of other violent rapes — was not only very strong, but was undisputed. The State's questions and comments did not mislead the jury; in fact, they were directed at clarifying for the jury Dr. Engum's true position and the trustworthiness of his testimony. These remarks were isolated to only Dr. Engum and to his testimony, albeit some of which involved Rev. Butler's testimony by association. But the State did not impugn defense counsel or any other witnesses with this impeachment evidence or questioning. Finally, and the only factor that would cut against the State here, there is no dispute that these remarks were made deliberately.

Based on our review of the governing law, these particular remarks, and the circumstances in which they arose, we do not find prosecutorial misconduct in this

instance.  Nichols is not entitled to habeas relief on his claims relative to the disclosure of his psychologist's notes.

## III.

For all of the foregoing reasons, we **AFFIRM** the judgment of the district court. Nichols is not entitled to habeas relief on any of the claims he has raised herein.

———————————

**CONCURRENCE**

———————————

BOYCE F. MARTIN, JR., Circuit Judge, concurring.  In this, my last death penalty case as a judge on the Sixth Circuit, I must concur in affirming the judgment of the district court.  Despite my concurrence, I continue to condemn the use of the death penalty as an arbitrary, biased, and broken criminal justice tool.  The facts of this case make it one of the more tragic and disturbing cases that I have heard in years.  While Nichols' actions are despicable, I cannot ignore the fact that his actions were committed in the late 1980s and that he was convicted in 1990.  Nichols' execution was supposed to take place in 1994.  I have been on this bench since 1979, and for twenty-three of my thirty-four years as a judge on this Court this case has been moving through our justice system, consuming countless judicial hours, money, legal resources, and providing no closure for the families of the victims.  Retired Supreme Court Justice John Paul Stevens has called for a dispassionate and impartial comparison of the enormous cost that death penalty litigation imposes on society with the benefits it produces.  The time, money, and energy spent trying to secure the death of this defendant would have been better spent improving this country's mental-health and educational institutions, which may help prevent crimes such as the ones we are presented with today.